*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0155p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

RONALD PHILLIPS,

        *Petitioner-Appellant,*

    *v.*

MARGARET BRADSHAW, Warden,

        *Respondent-Appellee.*

No. 06-4418

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 03-00875—Kathleen McDonald O'Malley, District Judge.

Argued: July 29, 2009

Decided and Filed: June 1, 2010

Before: SILER, COLE, and McKEAGUE, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY FARRELL SWEENEY, Cleveland, Ohio, for Appellant. Adam Michael Van Ho, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY FARRELL SWEENEY, Cleveland, Ohio, Ruth L. Tkacz, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Sarah A. Hadacek, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

SILER, J., delivered the opinion of the court, in which McKEAGUE, J., joined. COLE, J. (pp. 34-47), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

SILER, Circuit Judge. Ronald Phillips was convicted of rape and aggravated murder of Sheila Marie Evans and sentenced to death. The Ohio courts upheld his conviction and sentence on direct review and in post-conviction proceedings. The federal district court

1

denied his petition for a writ of habeas corpus under 28 U.S.C. § 2254.  For the following reasons, we **AFFIRM** the district court's denial of Phillips's petition.

## I. BACKGROUND

**A.      Facts**

On direct appeal, the Ohio Supreme Court recited these facts:

> On January 18, 1993, Sheila Marie Evans, age three, died as a result of cardiovascular collapse due to, inter alia, severe, blunt force trauma to her abdomen.  At the time, Sheila's mother, Fae Evans, was dating and occasionally cohabiting with [Phillips].  In addition to Sheila, Evans had two other children, Sara, twenty-nine months old, and Ronald, Jr., [Phillips's] infant son.

> Shortly after 10:00 a.m. on the morning of January 18, 1993, Fae Evans took Ronald, Jr. to see the family physician for a routine physical examination. [Phillips] remained at Evans's apartment to care for Sheila and Sara.  Evans returned to the apartment at approximately 11:25 a.m. and found [Phillips] sitting in the kitchen.  Soon thereafter, Evans called out to her daughters, but they failed either to respond or to appear.  [Phillips] walked into the girls' bedroom and found Sheila lying on her bed motionless, pale and cold.  He then lifted Sheila and carried her downstairs to his grandmother's apartment.  Hazel Phillips, [Phillips]'s grandmother, telephoned the 911 emergency operator, reported that Sheila was not breathing, and relayed instructions on performing cardiopulmonary resuscitation to [Phillips].  [Phillips] in turn attempted to revive Sheila until medical assistance arrived.

> Paramedics from the city of Akron responded to the 911 call within four minutes of being dispatched and immediately transported Sheila to Children's Hospital in Akron.  Upon her arrival at the emergency room, Sheila was not breathing and had no pulse.  The first physician to examine Sheila, Dr. Eugene Izsak, noted that she had multiple bruises on her torso, a distended stomach, apparent internal abdominal injuries, and a stretched anus with some acute, recent changes.  Dr. Izsak's medical team continued cardiopulmonary resuscitation and was eventually able to obtain a pulse.  Sheila was transported to the operating room after spending approximately one hour in the emergency room.  Dr. Robert Klein performed emergency abdominal surgery, which revealed that Sheila's abdominal cavity was filled with a significant amount of free air and blood, and that a portion of her intestine, the duodenum, was perforated and gangrenous. Dr. Klein removed the dead portion of the intestine, and attempted to control the internal bleeding. Based upon his observations, Dr. Klein determined that the injury to the duodenum had been inflicted at least two days prior to Sheila's

admission into the hospital.   Despite the significant medical efforts performed at Children's Hospital, Sheila died later that day.

On January 19, 1993, Dr. William Cox, the Summit County Coroner, conducted an autopsy on Sheila.  During his external examination of Sheila, Dr. Cox documented more than one hundred twenty-five bruises, many of which he identified as acute injuries that had been inflicted within a few hours of death.  The bruising indicated that Sheila had been severely beaten about her head, face, upper and lower torso, arms, legs, and genitalia.  He also detailed that the blows to Sheila's abdomen had resulted in severe internal trauma, including hemorrhaging in her stomach, intestine and other internal organs.  Dr. Cox examined the section of Sheila's bowel that had been surgically removed, and determined that the injury to the duodenum had occurred approximately forty-eight hours prior to her death.  During that forty-eight-hour period, Dr. Cox opined, Sheila would have suffered from intense abdominal pain, an inability to eat, vomiting, a high temperature, and listlessness.  The beating Sheila suffered on the morning of January 18, 1993 caused the already necrotic and gangrenous duodenum to rupture.  Dr. Cox concluded that Sheila died as a result of cardiovascular collapse stemming from the severe, blunt force trauma to her abdomen, and the numerous related complications.

Dr. Cox also discovered during the autopsy evidence of acute anal penetration.  Based upon the presence of contusions and lacerations, Dr. Cox determined that Sheila had sustained repetitive anal penetrations over a period of time, and that the most recent anal trauma had occurred sometime during the morning of January 18, 1993.  Given the absence of abrasions within the rectum, Dr. Cox further concluded that Sheila had been anally penetrated by a penis rather than by a finger or some other foreign object.

At approximately 3:00 p.m. on the day Sheila died, Detective Jan Falcone, an officer with the Juvenile Bureau of the Akron Police Department, interviewed [Phillips] at the police station.  Although [Phillips] was not placed under arrest, Falcone read [Phillips] his Miranda rights, which he waived.  During the interview, [Phillips] admitted that on Friday, January 15, 1993, or Saturday, January 16, 1993, he had spanked Sheila three times with an open hand.  After the spanking, [Phillips] noticed bruises on the girl's bottom, which surprised him.  He said, "I really didn't think I spanked her that hard but I told Fae I would not do it any more."  [Phillips] indicated that Sheila had not felt well during the weekend, and that she had vomited several times.

[Phillips] also told Falcone that Sheila had been injured on several previous occasions.  He recalled one incident in which Sheila fell on a railroad spike which penetrated either her vagina or anus.  On another occasion, [Phillips] claimed that Sheila hurt her "vagina and stomach area" when she jumped from a dresser to a bed and struck the corner of the bed.  Sheila bruised her eye and cut her lip when she fell down a flight of stairs.  [Phillips] denied having ever touched Sheila or Sara in their "private areas."

At some point during the interview, [Phillips] was informed that Sheila had died. Falcone then asked [Phillips] again what had happened to Sheila. [Phillips] responded that the night before Sheila's death, he had observed Evans in the girls' bedroom standing over Sheila with both fists clenched after hearing Sheila scream, "Don't beat me." The interview ceased after that exchange, and [Phillips] left the police station. In total, the interview lasted approximately seven hours, during which time [Phillips] was provided with food, beverages, and several breaks.

On Wednesday, January 19, 1993, [Phillips] telephoned the Akron police station in order to speak with the detectives who were investigating Sheila's death. Detective Ronald Perella, a detective assigned to the case, was attending Sheila's autopsy at the time [Phillips's] call was received and thus was unable to immediately speak with appellant. The next morning, Perella and his supervisor, Sergeant Dye, drove to South Alternative School, where [Phillips] was enrolled as a student. The officers met with [Phillips] and asked him to return to the police department for further questioning. [Phillips] complied, was driven to the Juvenile Bureau of the police department, and taken to an interviewing room. Perella read [Phillips] his Miranda rights, which he again waived, and asked [Phillips] to share whatever additional information he wished to convey. [Phillips] then repeated the same information he had given to Detective Falcone on the previous day. The detectives questioned [Phillips] as to why he had telephoned them if he simply wanted to reiterate his earlier statement. They also informed [Phillips] that the coroner had performed an autopsy on Sheila, and therefore knew everything that had happened to her.

At that point, [Phillips] asked Sergeant Dye to leave the room so that he could speak with Detective Perella alone. Dye agreed. Once they were alone, [Phillips] told Perella, "I don't want to go to jail, I don't want to get pumped in the butt." Perella responded that "not everybody who gets arrested goes to jail, that there could be counseling but without knowing what [Phillips] wanted to talk about, that [Perella] couldn't promise him anything except to tell the prosecutor and the judge that he cooperated." [Phillips] then confessed that on the morning of January 18, 1993, he "lost it" and repeatedly hit Sheila. [Phillips] explained that he had called Sheila three times for breakfast and she had failed to respond. As a result, [Phillips] went to the girls' bedroom, pulled the covers off Sheila, and began hitting her, throwing her against the walls, and dragging her by her hair. During the beating, [Phillips] noticed that Sheila was not wearing underwear, which caused him to become sexually aroused. After beating Sheila, [Phillips] stated he put Vaseline on her anus and inserted his fingers. While [Phillips] admitted that he thought about anally penetrating the three-year-old girl with his penis on that morning, he denied doing so. [Phillips] did confess to anally penetrating Sheila with his penis on two prior occasions, but claimed that Evans had paid him to perform those acts. Toward the end of the approximately three-hour interview, [Phillips] prepared a handwritten statement detailing the events to which he had

verbally confessed. Shortly after he completed the written statement, [Phillips] was arrested.

*State v. Phillips*, 656 N.E.2d 643, 650-52 (Ohio 1995).

## B.        Procedural history

On August 18, 1993, an Ohio jury convicted Phillips on one count of aggravated murder, one count of felonious sexual penetration, and three counts of rape. On September 14, 1993, the trial court adopted the jury's recommendation and sentenced Phillips to death on the aggravated murder conviction and to life imprisonment on each of his remaining convictions. The Ohio Court of Appeals and the Ohio Supreme Court affirmed his convictions and sentence. *State v. Phillips*, No. 16487, 1994 WL 479164 (Ohio Ct. App. Aug. 31, 1994); *Phillips*, 656 N.E.2d at 673.

In 1996, Phillips filed a state petition for post-conviction relief, which the trial court denied. The Ohio Court of Appeals affirmed in part and reversed in part, remanding for further proceedings. *State v. Phillips*, No. 18949, 1999 WL 58961 (Ohio Ct. App. Feb. 3, 1999). On remand, the trial court again rejected Phillips's petition, and the Ohio Court of Appeals affirmed. *State v. Phillips*, No. 20692, 2002 WL 274637 (Ohio Ct. App. Feb. 27, 2002). The Ohio Supreme Court denied Phillips's request for further review. *State v. Phillips*, 769 N.E.2d 403 (Ohio 2002). In 2003, Phillips petitioned for a writ of habeas corpus, alleging twenty-five separate grounds for relief. The district court denied his petition but granted him a certificate of appealability ("COA") on six claims. *Phillips v. Bradshaw*, No. 5:03 CV 875, 2006 WL 2855077 (N.D. Ohio Sept. 29, 2006).

## II. ANALYSIS

The six claims certified for appeal are: (1) whether Phillips's conviction for aggravated murder was supported by sufficient evidence; (2) whether the jury's finding that Phillips raped Sheila on the morning of her death was supported by sufficient evidence; (3) whether the jury's finding that Phillips intended to kill Sheila was supported by sufficient evidence; (4) whether members of the jury were inflamed by the statements of a grand juror; (5) whether the trial court improperly instructed the jury outside the presence of Phillips and his counsel; and (6) whether trial counsel rendered ineffective assistance during the

mitigation phase. Phillips also asserts claims of prosecutorial misconduct and erroneous jury instructions, but he has not obtained a COA as to these issues. Accordingly, these issues are not before us. *See Owens v. Guida*, 549 F.3d 399, 408, 414 (6th Cir. 2008).

## A.      Standard of review

We review the district court's decision to grant or deny a habeas petition de novo. *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009). Because Phillips filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), we may grant the writ "with respect to a 'claim that was adjudicated on the merits in state court proceedings' if the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Murphy*, 551 F.3d at 493 (quoting 28 U.S.C. § 2254(d)(1)). "A state-court decision is contrary to clearly established federal law 'if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Id*. at 493-94 (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). "A state-court decision is an unreasonable application of clearly established federal law if it correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case, or if it either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context." *Id*. at 494 (quotation marks and citations omitted). The AEDPA standard of review only applies to claims that were "adjudicated on the merits in State court proceedings." *Hartman v. Bagley*, 492 F.3d 347, 356 (6th Cir. 2007).

**B.        Ineffective assistance of counsel**

We turn first to whether counsel for the defendant provided adequate assistance at the penalty phase of Phillips's trial because we see this as the central issue in this appeal.

*1.        State court decisions*

The Ohio Supreme Court rejected this claim:

> Appellant contends that his counsel introduced "paltry evidence" in mitigation, and presented appellant in a manner that provided the jury with no reasonable means to recommend a sentence other than death. We disagree. The defense introduced six witnesses during the mitigation hearing in addition to appellant's unsworn statement. Appellant's grandmother, mother, father, brother and neighbor described appellant as a kind, helpful, friendly, and good person who never abused drugs or alcohol and who cared a great deal for all of Fae Evans's children. The defense also introduced the fact that appellant did not have a juvenile or criminal record, which appellant repeated in his unsworn statement. A defense psychologist presented expert testimony that appellant functions with a "low average" level of intelligence, that he is "a rather simple, emotionally immature, psychologically inadequate person" who is ill-equipped to deal with the pressures of a family situation. Added to the evidence of appellant's age (nineteen) and his expressed remorse, the evidence presented in mitigation fails to support a claim of ineffective assistance of counsel.

*Phillips*, 656 N.E.2d at 659.

After Phillips raised this issue again in his post-conviction petition, the Ohio Court of Appeals concluded that it was meritless:

> Mr. Phillips claimed that his convictions are void or voidable because he was denied the effective assistance of trial counsel in the mitigation phase of his trial when his counsel: 1) failed to request Children's Services records in order to get information both on Mr. Phillips and the environment in which he was raised and 2) neglected to request funds for a mitigation specialist, who would have gathered complete background information on Mr. Phillips. He avers that, had a mitigation specialist been retained, the psychologist could have conducted a more reliable psychological evaluation of Mr. Phillips and his attorneys could have presented complete mitigating evidence to the jury. He argued that, as a result of his counsel's allegedly deficient performance, his constitutional rights guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 5, 9, 10, 16 and 20 of the Ohio Constitution were violated.

As previously discussed, before a hearing is granted in proceedings for postconviction relief upon a claim of ineffective assistance of trial counsel, the petitioner bears the initial burden to submit evidentiary material containing sufficient operative facts that demonstrate a substantial violation of any of defense counsel's essential duties to his client and prejudice arising from counsel's ineffectiveness. [*State v.*] *Calhoun*, 86 Ohio St.3d [279,] 289, 714 N.E.2d 905 [(1999)]; *see, also Strickland*, 466 U.S. at 687 []. Furthermore, when a defendant challenges a death sentence, the appropriate standard for determining whether prejudice resulted "is whether there is a reasonable probability that, absent the errors, the sentencer-including an appellate court, to the extent it independently reweighs the evidence-would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695 [].

Generally, the decision of what mitigating evidence to present during the penalty phase of a capital trial is a matter of trial strategy. *State v. Keith* (1997), 79 Ohio St.3d 514, 530, 684 N.E.2d 47. Moreover, debatable trial tactics generally do not constitute ineffective assistance of counsel. [*State v.*] *Clayton*, 62 Ohio St.2d at 49, 402 N.E.2d 1189 [(1980)]. This court must indulge in a strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance. [*State v.*] *Hartman*, 93 Ohio St.3d at 300, 754 N.E.2d 1150 [(2001)]. Significantly, the existence of alternative or additional mitigation theories generally does not establish ineffective assistance of counsel. [*State v.*] *Combs*, 100 Ohio App.3d [90,] 105, 652 N.E.2d 205 [(1994)].

During the penalty phase of trial, Mr. Phillips' counsel presented the testimony of Mr. Phillips' grandmother, mother, father, brother, and neighbor. Through their testimonies, counsel attempted to show that Mr. Phillips was a kind and caring person, who was always trying to help his relatives and friends and who cared deeply for Ms. Evans' children. Evidence was presented that, during Mr. Phillips' youth, his family got along well together and routinely went on family camping trips and played games. Counsel also introduced evidence that, despite being raised in a high crime area and having immediate family members with criminal backgrounds, Mr. Phillips made a conscious choice to abstain from drug and alcohol abuse, avoid gang activity, and improve his grades so that he could graduate from high school and join the military. Mr. Phillips had no prior criminal record and was nineteen years old at the time of the murder. Additionally, Dr. James Brown, a defense psychologist who met with Mr. Phillips on four occasions, interviewed his parents, and administered psychological tests, testified that Mr. Phillips was an emotionally immature individual with below average intelligence, who was unable to cope with the stresses of a family situation. Although defense counsel was aware that Mr. Phillips' family history was less than ideal, counsel chose to downplay those facts, and instead, focus on Mr. Phillips' character, family support, and his potential for rehabilitation.

In his petition, Mr. Phillips attacked his trial counsel's mitigation strategy, asserting that such strategy was a result of poor preparation and inadequate investigation into his background. To that end, Mr. Phillips cites his counsel's failure to request Summit County Children's Services records and to obtain a mitigation specialist. He argues that, had more background information been obtained by his counsel, a reliable psychological evaluation could be performed and the jury could have been presented with complete mitigating evidence.

In furtherance of this assertion, Mr. Phillips proffered new evidence which tended to show that his father was verbally, emotionally, and physically abusive to the children in his household. He also submitted a psychological evaluation of a psychologist who was provided with more background information than Dr. Brown. This psychologist opined that Mr. Phillips may suffer from a variety of psychological disorders, including bipolar disorder, but stated that, before he could "complete a valid and comprehensive evaluation," he would need to obtain additional information. Mr. Phillips also presented affidavits of a mitigation specialist and a capital litigation specialist. The mitigation specialist concluded that the mitigation phase was not handled properly by defense counsel. The capital litigation specialist did not address Mr. Phillips' case but rather described effective methods of presenting mitigating evidence.

Initially, we note that hiring a mitigation specialist in a capital case is not a requirement of effective assistance of counsel. *State v. McGuire* (1997), 80 Ohio St.3d 390, 399, 686 N.E.2d 1112. A review of the record in this case reveals that trial counsel performed an adequate investigation of Mr. Phillips' personal background and presented the expert testimony of a psychologist, thereby providing insight into Mr. Phillips' mental condition. Trial counsel chose to present Mr. Phillips as a caring, helpful, and decent person, who was a "salvageable" human being and would do well in prison. On the other hand, Mr. Phillips' petition subscribes to an alternative mitigation strategy, namely focusing on the dysfunction and abusive family environment and the absence of a moral and social compass for Mr. Phillips. The evidence adduced with the petition supports this alternative mitigation strategy-a strategy that may actually have been less persuasive.

As previously discussed, the existence of alternative or additional mitigation theories generally does not establish ineffective assistance of counsel. *Combs*, 100 Ohio App.3d at 105, 652 N.E.2d 205. Based on the foregoing, we cannot find that the trial court erred in determining that Mr. Phillips failed to set forth sufficient operative facts that demonstrate a substantive violation of his trial counsel's essential duties. *See Calhoun*, 86 Ohio St.3d at 289, 714 N.E.2d 905. Significantly, on direct appeal, the Ohio Supreme Court held that the evidence presented in mitigation was not paltry, as Mr. Phillips contended, and failed to support a claim of ineffective assistance of counsel. *Phillips*, 74 Ohio St.3d at 86, 656 N.E.2d 643. Furthermore, this court holds that Mr. Phillips failed to adduce sufficient

operative facts establishing that there was a reasonable probability that, absent trial counsel's allegedly deficient performance, the sentencer would have concluded that the aggravating circumstance did not outweigh the mitigating factors beyond a reasonable doubt.

*Phillips*, 2002 WL 274637, at *9-11.

### 2.    *Legal standard*

Phillips claims that his counsel were ineffective because they failed to investigate, discover, and present evidence found in the Summit County Child Services Bureau ("CSB") records and to interview his half-siblings about the Phillips' home. He claims that such investigation would have revealed extensive mitigating information about his background that was important for the jury to hear and that would have allowed his psychologist to opine accurately about his psychological condition and the reasons for his crime. We engage in a two-part inquiry when reviewing ineffective-assistance-of-counsel claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). A counsel's performance is deficient if it "fell below an objective standard of reasonableness." *Id*. at 688. *Strickland* held that:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id*. at 690-91. Counsel has an obligation to perform a thorough investigation of the defendant's background or make a reasonable decision that such investigation is unnecessary. *See Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). We must decide "whether

the investigation supporting counsel's decision not to introduce mitigating evidence of [Phillips's] background was *itself reasonable.*" *Id.* at 523. "A counsel's performance is deficient if he committed errors so serious that he was not performing at a reasonable professional level. The burden is on the defendant to make such a showing by 'identify[ing] the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.'" *Williams v. Coyle*, 260 F.3d 684, 703 (6th Cir. 2001) (en banc) (quoting *Strickland*, 466 U.S. at 690).

"We review the decision of the last state court to reach this point, the state court of appeals [in post-conviction proceedings] for compliance with AEDPA." *See Johnson v. Bagley*, 544 F.3d 592, 599 (6th Cir. 2008). "[I]n judging the reasonableness of the adjudication, we look to *Wiggins* [] and *Rompilla* . . . because they . . . 'applied the same clearly established precedent as *Strickland*.'" *Id*. (quoting *Wiggins*, 539 U.S. at 522).

Even if there is deficient performance, there is no constitutionally ineffective assistance of counsel unless Phillips was prejudiced by the performance. To satisfy this prong, Phillips "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Because the state court decided this constitutional issue in cursory fashion "'without extended discussion,'" we apply a modified form of AEDPA review. *See Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005) (quoting *Harris v. Stovall*, 212 F.3d 940, 943 n.1 (6th Cir. 2000)). The modified-AEDPA standard of review requires us to "conduct a careful review of the record and applicable law, but nonetheless bars [us] from reversing unless the state court's decision is contrary to or an unreasonable application of federal law." *Id*. (citing *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir.2005)).

3.        *Counsel's mitigation efforts and the evidence presented to the jury*

Phillips's counsel did perform some investigation into potential mitigating factors. Kerry O'Brien and Michael Edminister represented Phillips at trial, with Edminister handling most of the responsibilities related to the mitigation phase. The trial court appointed a psychologist, Dr. James Brown, to evaluate Phillips, and the court allowed Phillips's counsel to hire a mitigation specialist. Counsel retained the services of a former Akron police officer who, according to counsel, was the only available option with the resources available.

In his efforts to acquire mitigating evidence, Edminister talked with Phillips's mother and father, at least one of his siblings and one of his half-siblings, his grandparents, neighbors, and former teachers. Edminister obtained Phillips's school records and reviewed some CSB records relating to the Phillips family. At the CSB office, Edminister met with the prosecutor and a CSB attorney and was given access to only five files, none of which he was permitted to copy. Edminister took handwritten notes about the contents of those files, stating that one of them was a "very important file for mitigation purposes." Edminister's notes from what appears to be an interview with the Phillips family also indicate that "CSB came out inquiring about possible sexual abuse of William, Sr. on daughter Tanya," but Edminister failed to confirm this in CSB's records. He never viewed CSB's other files on the Phillips family and never made any other effort to obtain access to those files or copy any of the materials. In Edminister's and O'Brien's conversations with Phillips and his family members, none revealed a history of abuse in the Phillips household.

Dr. Brown, whom counsel provided with a summary of the case and Phillips's written confession, interviewed Phillips on four occasions and performed at least two psychological tests on him. He also interviewed Phillips's parents. He prepared a five-page report summarizing his findings. It noted that four of Phillips's siblings "exhibit rather marginal adjustments to society" and that, like Phillips's parents, three of Phillips's siblings had felony convictions. The report stated that Phillips showed signs of "character deficiencies," such as emotional immaturity, "underlying hostility and [an] inflexible approach to conflict," "remarkably poor tolerance for stress and pressure," "self-doubt, inferiority and feelings of incompetence," "psychological inadequacy," and an "extremely simplistic and immature view of the world." However, Dr. Brown concluded that Phillips was not mentally ill and did not suffer from a personality disorder.

At Phillips's mitigation hearing before the jury, counsel called several witnesses to testify. A neighbor, Lonnie Bell, testified that Phillips was always respectful and would help him with household chores. Hazel Phillips, Phillips's grandmother, testified that Phillips was a normal boy who was generally obedient and helped her with chores around the house. William Phillips, Jr., Phillips's brother, testified that he and Phillips played together as children and engaged in normal activities, such as fishing, swimming, and camping. He also

explained that Phillips was generally a good student without disciplinary problems and was good with younger children.

Phillips's father, William, Sr., testified that Phillips was a good child with many friends. He testified that Phillips was always respectful to his elders and that prior to his arrest for the present offenses, Phillips planned to join the Army to become a diesel mechanic. William, Sr. acknowledged physically punishing his children when they were disobedient. On cross-examination, he admitted that he had been convicted for obstruction of justice and receipt of stolen property. Donna Phillips, Phillips's mother, testified that Phillips was a normal child who was helpful around the house and assisted elderly neighbors with chores. She stated that Phillips never drank, smoked, or used drugs. While he had no behavior or disciplinary problems at school, Phillips was intellectually slower than the other students. On cross-examination, Donna admitted that Phillips had been suspended from school several times for disciplinary reasons, including gross insubordination to a teacher and physically harming another student. She also admitted that she knew of at least one occasion when the defendant had struck Fae Evans. Donna acknowledged that she had a felony conviction for aggravated drug trafficking.

Dr. Brown testified that Phillips came across as "a rather simple, emotionally immature, psychologically inadequate person" who harbored "a lot of anger[,]" felt "frustrated very easily[,]" lived with feelings of insecurity, inadequacy, and inferiority, and did not "feel particularly connected with any people[.]" Brown told the jury that "Phillips experienced repeated frustrations in his life," which caused his "anger [to] build[] up so that it comes out and it seems way out of proportion to what may trigger it." According to Brown, Phillips's IQ score was 87, which placed him in the low-average range, but he did not suffer from a mental disease, mental illness, retardation, or antisocial disorder. Brown stated that Phillips "came off much more like a 12-year old." Brown testified that it was "a little surprising" that Phillips had committed this crime, since he had managed to avoid any previous criminal record even though he had grown up in an "antisocial" environment. Brown found no evidence that Phillips had been beaten or sexually abused as a child, but he found that Phillips manifested a poor tolerance for stressful situations. He explained that Phillips needed a structured environment with rigid controls, where authority and the

consequences of not obeying authority were clearly delineated. Brown opined that Phillips could adjust well to prison.

Phillips made an unsworn oral statement on his own behalf. Despite growing up in a crime-infested neighborhood, he avoided drinking and using drugs. He tried to be helpful to his family and neighbors. He denied that he suffered abuse during his childhood. He also indicated that he had never been arrested prior to the current offense and had only one previous minor brush with the police. Once he started dating Evans, he helped care for her two young daughters, and he gave them a dog as a pet. After his son was born, Phillips cared for him as well.

### 4.        *Undisclosed mitigating evidence*

The following evidence was not presented to the jury during the mitigation phase and Phillips alleges its omission was due to ineffective assistance of counsel.

### a.        *Child Services Bureau records*

The nature of Phillips's home life is described in the course of nearly two decades worth of CSB records that his counsel apparently never saw. Phillips's mother had three children in a prior relationship: Tracy (born in 1965), Mary (born in 1966), and Edward, or "Eddie" (born in 1968). She then married Phillips's father, William, Sr., with whom she had four children: William, Jr. (born in 1972), Petitioner (born in 1973), Eric (born in 1975), and Tanya (born in 1976). The family moved from Pennsylvania to Akron, Ohio, when Phillips was two years old. CSB records state that the CSB's counterpart in Pittsburgh contacted CSB to warn that "[w]hile living in Pittsburgh, the three older children were frequently physically abused," and, on the seldom occasions when they came to school, "were marked and bruised." The Pittsburgh caseworker described the family's situation as "deplorable."

CSB visited the Phillips home in Akron and described Donna Phillips as an inadequate mother and the family as functioning "marginally" with multiple problems. In 1977, when Phillips was three years old, CSB received a complaint that Phillips's father was beating his step-children, grabbing them by the throat, and threatening them with additional physical abuse if they revealed to anyone that they were being beaten. However, the complainant noted that William, Sr. did not abuse his own children in the same manner. The

complainant also stated that there were dog feces "all over the place" at the Phillips home and that the children were "always dirty and unkempt." Following a visit to the Phillips home that year, a CSB caseworker stated that "[t]he house smelled terrible, was filthy dirty, was messy, and cluttered. The odor was overwhelming; it was a combination of their dog . . . old food and dirt." The children "looked hungry and not very well nourished." (*Id*.) During this time, Donna Phillips informed CSB that Phillips's father "comes and goes," and she falsely told CSB that they were divorced.

The next year, in 1978, CSB received another complaint that the three step-children were being beaten by both parents and that the family had threatened their neighbors with injury if they reported the abuse to CSB. The complainant told CSB that the "children are grabbed by the back of the neck, slapped across the face, beaten on [the] back and legs." The caller also believed that there were knives and guns in the house. When a CSB caseworker made a visit to investigate, she could not verify any abuse, but she described Phillips's father as screaming and swearing at the top of his lungs when confronted with the allegations, and she described the children as dirty and of marginal appearance.

Two years later, in 1980, when Phillips was six years old, CSB received a call reporting that the three step-children were "always being beaten" and that the previous day they had been beaten badly. However, the caller stated that the children were afraid to tell anyone. The following year, in 1981, the principal of Eddie's school contacted CSB to report a bruise on his arm allegedly caused by his mother. Donna Phillips admitted that she had hit both Eddie and William, Jr. with a belt in a fit of rage. In 1983, when Phillips was nine years old, Eddie reported to CSB that Phillips's father had grabbed him by the shoulder and thrown him onto a bench, causing a red mark and difficulty moving the arm. At that time, Phillips's father was living at the home sporadically, and a total of fifteen people were living in the home. Later that same year, one of the adults living in the home contacted CSB to report that Phillips's father "punches" his three step-children and had recently "punched Tracy in the face." Also in 1983, Eddie reported to CSB that his stepfather had twice pushed him, had pulled his hair, and had beaten him. On a visit to the Phillips home in 1983, a CSB caseworker described cockroaches crawling on the table and walls while she was interviewing Donna Phillips.

In 1984, a caller reported to CSB that in addition to physically abusing the older step-children, William, Sr. was molesting Mary. When interviewed by a social worker, the step-daughter admitted that William, Sr. had physically abused her in the past, but she denied any sexual abuse. Following additional complaints in 1985, all three of the older step-children confirmed that they had been physically abused by both parents. Tracy, who is mentally retarded, arrived at work with a bruised arm and a cut lip, stating that her mother had struck her in the face. In 1988, a caller informed the CSB that a drug raid was occurring at the Phillips house, and children were involved. It turned out that Donna Phillips had been illegally selling the prescription drug Ritalin. Both parents and Mary were arrested on drug-related charges, and various drugs and weapons were seized from the house. CSB reported that, at this time, the Phillips home was in "an extremely filthy condition" with "a rancid odor" and dog feces throughout the living area of the house. Phillips, who was in seventh grade at the time, was temporarily sent to live with his grandmother. Later in 1988, an anonymous caller informed CSB that the Phillips children were running wild, that Donna Phillips was in jail, and that the children were living with Phillips's father. In 1992, CSB received a report that the house was "disgusting [and] uninhabitable for human beings."

### b.     *Affidavits of Phillips's half-siblings*

In addition to the CSB reports, Phillips's three half-siblings submitted affidavits attesting to the violence and sexual abuse committed against them. Mary Phillips stated that Phillips's father physically disciplined Phillips, along with the three step-children. She also stated that Phillips's father "would break dishes over my head when I did not do them to his satisfaction." According to Mary, Phillips's father "used to beat my sister, Tracy, and me buck naked even when we were of high school age," that he "left black and blue marks on my butt for a month," and "used to beat us kids with a belt and smack our faces." She stated that her step-father "used to sexually fondle Tracy and me. Once, he took Tracy with him while looking for a business associate of his. After getting in the truck, [he] pulled off on a side street and started feeling her breast." She recounted an incident when she was eight years old and her step-father exposed his erect penis to her. She stated that he "used to grab my breast and feel on my butt." Mary also stated that William, Sr. would engage in fist fights with Phillips and was emotionally abusive toward him. Mary stated that she was never

contacted by Phillips's trial counsel. Tracy confirmed in her affidavit that Phillips's father had frequently beaten her.

Edward stated in an affidavit that "[t]he home that Ron and I grew up in was screwed up. Ron saw things he should never have seen." He stated that Phillips's father would grab the penises of the male children in the home while wrestling with them. He stated his belief that Phillips's father was having sexual relations with his youngest daughter, Tanya. Edward confirmed the regular beatings that William, Sr. inflicted on his children, stating that he "used to throw Tracy, Mary, and me up against the wall." He recounted an incident when he was twelve years old in which his father beat him on the back with a two-by-four. He also stated that William, Sr. had regularly beaten his wife and had thrown knives and dishes at her. Finally, he confirmed that Phillips's father "used to molest my sisters, Mary and Tracy, in that he would grab them by the butt or the breast and fondle them."

### c.     *Psychological report and testimony of Dr. Smith*

In the habeas proceeding, Phillips submitted an evaluation from clinical psychologist Dr. Robert Smith. Smith was provided with the CSB records and wrote an initial opinion following two interviews of Phillips in 1995 and 1996. He also wrote a supplemental report based on a follow-up interview in 2004 and testified before the district court.

Smith diagnosed Phillips as suffering from a mixed personality disorder with borderline and paranoid traits, and opined that Phillips might also suffer from bipolar or post-traumatic-stress disorder, although Phillips's refusal or inability to discuss certain subjects made him difficult to assess. In his initial written report, Smith noted that Phillips displayed a "level of defensiveness [that] is indicative of severe family dysfunction and an abusive background." Smith's administration of the Minnesota Multiphasic Personality Inventory-2 test resulted in his conclusion that "[i]t is likely that [Phillips] suffers from either a severe personality disorder, bipolar disorder, or schizophrenia." He reiterated in the conclusion of the report: "It is believed that Mr. Phillips suffers from a severe psychological disorder beyond his personality disorder, such as bipolar disorder or post traumatic stress disorder." Dr. Smith testified that Dr. Brown's prior determination that Phillips did not suffer from a mental illness or disorder was due to Brown's lack of awareness of the true history of Phillips's life.

Phillips admitted to Smith that he had been physically abused by his father. Phillips stated to Smith that, among other things, his father punched the children in the face and frequently hit them with little or no provocation. Phillips himself "ran away from home on several occasions to avoid his father's wrath." Phillips also stated that his parents paid for their houses with the proceeds of drug sales and purchased shoplifted food, clothing, and household items from their drug customers. He informed Smith that prostitution was common on the street in front of his childhood home and that he was exposed to drug use and sexual activity from a young age as a result of parties his parents regularly held at their house. Smith concluded that "Phillips' home was surrounded by crime and violence [and his] family was enmeshed in this criminal element and served as role models for violent attacks and criminal activities."

Dr. Smith was of the opinion that Phillips was sexually abused as a child, although Phillips never admitted it. He stated that childhood abuse is the "hallmark" of those who develop borderline personality disorder, and that "[Phillips] had the same code of silence that the other [Phillips] children had[, ][and Phillips's] feelings of guilt and shame were very evident."

Smith opined in his report that

> Phillips' misplaced loyalty to his family prevented him from sharing openly the extent of the abuse he endured. This protection of "family secrets" is common among children of abuse. They tend to blame themselves for the abuse the[y] suffer and fail to recognize that the behavior of their parents is abusive and inappropriate. . . . The difficulties Mr. Phillips has experienced with his interpersonal relationships, especially his sexual relations, strongly suggest that he was the victim of sexual abuse. The research has identified several characteristics of victims of sexual abuse (e.g., feelings of guilt and shame, difficulty with impotence, confusion about the role of sex- enmeshed with sadistic and masochistic behavior). Mr. Phillips reported many of these behaviors.

Smith also testified that it is common for men, even well into adulthood, to deny sexual abuse, noting especially that such men "fear being victims of future sexual abuse by other perpetrators" and "fear that other men within the prison environment may view [them] as open to various sexual activities and that they may take advantage of that."

Smith connected Phillips's childhood experiences to his personality disorder, and, in turn, to his crime. He testified:

> If we take Ronald's background and look at his family, what we have is ongoing history of violence, criminal activity, both by father, mother, and siblings. We know that the household is involving [sic] alcohol and drug abuse. We know there's drugs being sold out of the home. We know there's physical and sexual abuse going on. As a child, you're watching all of that, you're trying to formulate what does all this mean. For borderlines [*i.e.*, those with borderline personality disorder], the problem is that they are not sure what it means. . . . What they end up doing is reacting in a sort of survival way to their environment and they often misinterpret and overreact because of the dysfunction they experience so they become reactionary, overly aggressive . . . .
>
> [I]f you think about Ronald's background and what he knows about parenting, the only role models he has had are his mother and father, both physically abusive [] as long as he can remember and it didn't m[at]ter the age or sex of the child or what the child was doing, the response was always the same. Always physical violence.

Smith stated his belief in his initial report that "Mr. Phillips's disorders were directly related to the instant offense." In his testimony, he elaborated, explaining that "[a]n individual with borderline personality disorder has misperceptions all the time, misperceptions about themselves, [their] abilities and their role and misperceptions about other people and their relationships." Smith opined that Phillips misperceived Sheila's conduct and reacted as follows:

> [a child who is] not listening, not obeying, not responding, ignoring, becomes a sense of this is a threat to me as a person because I'm telling you, and I'm the authority, I'm the adult, you should respond and when you don't, what happened in my household is you get popped, you get punched, slapped, hit, you get beat because you do what you're told to do.

Smith also offered testimony about why Phillips was capable of raping Sheila. He testified that Phillips's borderline personality disorder inclined him toward both anger and a willingness to engage in deviant sexual activities encouraged by Evans:

> [Evans] is seven years older than [Phillips] is and is clearly the more mature person. Ronald is still living at home, still attending high school, has had really no ongoing sexual relationship and becomes involved with [Evans] who, as he described it, is very very, intriguing but he's sort of uncomfortable and confused and frightened by some of the things she

suggests, like sex with her sister and sex with her cousin. He doesn't denies [sic] he's aroused or finds it sexually interesting, but he's still confused and ashamed and doesn't know what is right and wrong.

She reassures him and takes on a maternal role. They develop a sexual relationship. She becomes pregnant and they now are forming this sort of very dysfunctional relationship.

He explained that Evans then encouraged Phillips to begin molesting and eventually rape Sheila:

[Phillips] indicated [that Evans] encouraged him to have physical contact [with Sheila]. I don't know if he saw it as sexual originally. . . . [A]s he described it, she would fondle him as he would touch Sheila so that would be arousing.

. . .

It's very unfortunate, but in working with [homeless, chemically dependent, and mentally ill women], we know that a number of the women, because of their own backgrounds, their own history of being physically and sexually abused, find various inappropriate behavior very arousing and many of the women will admit that they have sexually abused the[ir] children themselves, or observed their partner or encouraged their partner to be sexually abusive.

Dr. Smith testified that a clear connection existed between Phillips' abusive life in his parents' home, his resulting personality disorder, his violent and sexually deviant relationship with Evans, and, eventually, his crime.

   *5.   Prejudice*

We choose to focus on the prejudice prong of the *Strickland* test because it is easier to resolve, and there can be no finding of ineffective assistance of counsel without prejudice. *See Strickland*, 466 U.S. at 691-92. Because the state court did not unreasonably apply federal law when it found prejudice to be lacking, we do not need to discuss whether counsel's performance was deficient. *See Smith v. Spisek*, — U.S.— , 130 S.Ct. 676, 685-88 (2010) (*assuming* counsel's performance was deficient, but holding that it did not result in cognizable prejudice because there was no reasonable probability that the sentencing outcome would have been different but for counsel's error).

The state court found that, even assuming that counsel was deficient, Phillips was not prejudiced by the jury's ignorance of the subsequently discovered mitigating evidence. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of the mitigating evidence" adduced at trial and in post-conviction proceedings. *Wiggins*, 539 U.S. at 534-36; *see Rompilla v. Beard*, 545 U.S. 374, 393 (2005). "Prejudice is established where, taken as a whole, the available mitigating evidence 'might well have influenced the [sentencer's] appraisal of [the petitioner's] moral culpability.'" *Jells v. Mitchell*, 538 F.3d 478, 498 (6th Cir. 2008) (quoting *Williams v. Taylor*, 529 U.S. 362, 398 (2000)) (alterations in original). There is no prejudice if the newly available evidence is merely cumulative or is not substantially different from the evidence presented during the penalty phase. *See Beuke v. Houk*, 537 F.3d 618, 645 (6th Cir. 2008).

"When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. "Ohio is a weighing state, which means that the aggravating circumstances must outweigh the mitigating factors in order to impose the death penalty." *Hamblin v. Mitchell*, 354 F.3d 482, 493 (6th Cir. 2003).

As previously stated, we are applying a modified form of AEDPA review on this issue, which requires us to assess "whether the Ohio court's application of the *Strickland* standard . . . was unreasonable or its decision contrary to the standard." *Williams v. Coyle*, 260 F.3d at 704. Thus, after reweighing the evidence, we may only reverse if Phillips can demonstrate a reasonable probability that, but for the alleged error of omitting certain mitigating evidence, he would not have been sentenced to death, *Strickland*, 466 U.S. at 694, and if we find that the state court's conclusion was contrary to or an unreasonable application of federal law, *Williams v. Coyle*, 260 F.3d at 704. For the following reasons, we conclude that Phillips has not met this burden.

Phillips's counsel presented the following evidence during the mitigation phase of sentencing: (1) a psychological report of Phillips by Dr. Brown, which included a diagnosis of Phillips's character deficiencies such as emotional immaturity, inflexible approach to

conflict, poor tolerance for stress and pressure, self-doubt and inferiority, psychological inadequacy, a simplistic and immature view of the world, but which concluded that Phillips was not mentally ill and did not suffer from a personality disorder; (2) expert testimony from Brown that Phillips functioned with a "low average" level of intelligence, is "a rather simple, emotionally immature, psychologically inadequate person," is "ill-equipped to deal with the pressures of a family situation," and would adapt well to prison life; (3) testimony from five other witnesses, including Phillips's mother, father, brother, grandmother, and neighbor, who testified that Phillips was a "kind, helpful, friendly, and good person who never abused drugs or alcohol and who cared a great deal for all of Fae Evans's children"; (4) evidence of Phillips's youthfulness when the crime was committed (nineteen); (5) Phillips's lack of a criminal record; and (6) a statement from Phillips in which he expressed remorse for his actions.

Phillips claims that he was prejudiced by the following information that should have been introduced as mitigating evidence: (1) CSB records that indicated physical abuse of Phillips's siblings, unsanitary conditions of the Phillips' home, drug abuse by Phillips's parents, and an overall hostile living environment; (2) affidavits from Phillips's half-siblings that indicated mistreatment by Phillips's father, such as physical abuse of themselves, sexual abuse to Mary and Tracy, and possible sexual abuse of Phillips's sister Tanya; and (3) a report and testimony from Dr. Smith based on an interview in 2004, in which Smith diagnosed Phillips with a borderline personality disorder.

Although Phillips claims he was prejudiced by the omission of the additional evidence, the majority of the additional evidence contradicts the theory that his counsel presented during the mitigation phase. Counsel presented the theory that Phillips was a person of low intelligence who was generally considered a good person, but whose pent-up frustrations and aggressions led him to snap. By introducing positive evidence of Phillips's background, his counsel attempted to show he deserved a second chance at life. In contrast, the undisclosed evidence showed that Phillips grew up in a less than ideal environment, surrounded by abuse, crime, and drugs. The purpose of introducing this evidence would have been an attempt to explain the reasons behind Phillips's actions. Therefore, although most of the additional evidence was not cumulative, *see Beuke*, 537 F.3d at 645, it would not have fit neatly into counsel's chosen mitigation theory, and a different approach would have

been required if the totality of the mitigating evidence were to be presented. Nonetheless, we proceed with the reweighing of the evidence.

To establish prejudice, Phillips must show that a reasonable probability exists that, but for counsel's deficient performance, the *result* of the proceedings would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. In determining prejudice, the court must reweigh the evidence in aggravation against the totality of the available mitigating evidence adduced at trial and in post-conviction proceedings. *Wiggins*, 539 U.S. 534-36. Phillips demonstrates prejudice if a reasonable probability exists that at least one juror would have reached a different result. *See id.* at 537. In analyzing the aggravating evidence against the totality of the mitigating evidence, we find that the addition of the undisclosed mitigating evidence is insufficient to conclude that the state court's decision was contrary to or an unreasonable application of federal law. *See Beuke*, 537 F.3d at 646. The aggravating evidence presented in this case includes the particularly heinous way in which the murder was committed, that is, the brutal beating and anal rape of a three-year-old girl. Section 2929.04(B) of the Ohio Revised Code listed the following items as mitigating factors in death penalty cases:

> (1) Whether the victim of the offense induced or facilitated it;
> (2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
> (3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;
> (4) The youth of the offender;
> (5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
> (6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
> (7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

Phillips's counsel presented evidence on the mitigating factors listed in subsection four, five, and seven. The additional undisclosed mitigating evidence only provided further support for subsection seven. This would arguably have been inconsistent with some of the

mitigating evidence Phillips's counsel already presented under this factor.  While this additional evidence may have been helpful, it does not render the state court's finding of a lack of prejudice an unreasonable application of *Strickland*.  *See Williams v. Coyle*, 260 F.3d at 705.

In looking at the undisclosed mitigating evidence, one component towers above the rest.  The overwhelming majority of the additional evidence is evidence of physical and sexual abuse of Phillips's siblings, namely, his half-siblings.  There was evidence that Phillips's father sexually abused Mary and Tracy on numerous occasions, but the evidence of sexual abuse of Phillips personally was virtually non-existent.[1]  Likewise, the evidence of physical abuse of Phillips's half-siblings was apparent, but evidence of abuse of Phillips by his parents was minimal at best.

The CSB records indicate that Phillips's half-siblings were physically abused by Phillips's mother and father.  However, the records are less conclusive as to the presence of physical abuse of Phillips's full siblings.  Most importantly,  in over fifteen years of CSB records, there are no reports that indicate that Phillips, himself, was physically abused.  Likewise, the affidavits of Phillips's half-siblings indicate that they were the main recipients of abuse by Phillips's father.  Only minor accounts by Phillips's half-siblings record any abuse of Phillips.

While we have no doubt that the conditions in the home and the treatment of Phillips's siblings made for an unpleasant living environment, they do not tip the aggravation-mitigation scale in favor of mitigation. Further, an examination by a mental health professional with this information would not have supplied the court with evidence that "differ[ed] in a substantial way-in strength and subject matter-from the

---

[1]The only evidence in the record of sexual abuse of Phillips was the testimony of Dr. Smith, who stated, "My opinion is he was sexually abused."  There is no admission by Phillips, or testimony from his family, that he was sexually abused.  Moreover, Phillips never admitted he knew of any sexual abuse by his father of his sisters.  Hence, as the dissent implicitly acknowledges, Dr. Smith's "opinion" is based on speculation—speculation that is not only without factual support in the record, but is actually contrary to the record evidence.  Notwithstanding the lack of evidence that Phillips was the victim of sexual abuse, Dr. Smith noted the existence of circumstances which, when viewed in light of other sexual abuse victims' profiles, "strongly suggest" that Phillips was sexually abused.  It follows that even assuming Dr. Smith's speculative opinion would have been admissible at all, its reliability and weight would certainly have been suspect in the eyes of the jury.

evidence actually presented at sentencing."**2** *See Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005).

Phillips fails to show that the state court's decision was contrary to or an unreasonable application of *Strickland* under the modified-AEDPA standard. "A decision of the state court is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Howard*, 405 F.3d at 467 (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)) (alterations in original).

"An 'unreasonable application' occurs when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting Taylor, 529 U.S. at 413) (alteration in original). "A state adjudication is not 'unreasonable' 'simply because [a federal habeas court] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Id.* (quoting Taylor, 529 U.S. at 411) (alteration in original). "Instead, the state court's application of established Supreme Court precedent must be objectively unreasonable." *Id.* (citing *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)). Since the state court's conclusion of no prejudice was not contrary to clearly established federal law, and it was not an unreasonable application of federal law to the case, we are precluded from reversing the state court's decision.

---

**2**The dissent posits that if Dr. Smith had been allowed to state his "opinion" that Phillips may have been sexually abused by his father and that this caused him to suffer from a borderline personality disorder, the jury would have been offered an explanation for this "shocking atrocity"—for this otherwise inexplicable brutal rape and murder of a three-year old girl. In our opinion, this reasoning suffers from two flaws. First, it ignores the fact that even Dr. Smith was unable to identify a specific causal nexus between the sexual abuse that Phillips presumptively suffered and the unthinkable brutality that he unleashed on a helpless toddler. Second, in view of the heinousness of the offense conduct, the notion that a psychologist's speculative explanation would have been so mitigating of Phillips's culpability as to create a reasonable probability of a different sentencing outcome is simply untenable.

**C.       Sufficiency of the evidence**

Phillips also argues that no rational jury could have found, based on the evidence presented at trial, that he purposely caused Sheila's death while "committing or attempting to commit . . . rape," as is required for a conviction of aggravated murder under Ohio Revised Code § 2903.01(B).  He challenges the sufficiency of the evidence in three ways:  first, he claims that the evidence does not support a finding that his beating of Sheila on January 18 caused her death; second, he claims that the evidence does not support a finding that he raped Sheila during the course of that beating; and third, he claims that the evidence does not support a finding that he intended to kill Sheila.

In determining whether sufficient evidence existed to support a jury's conviction, we ask whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).  We give deference both to the jury's verdict and, under AEDPA, to the state court's determination of whether that verdict was supported by sufficient evidence.  *See Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007).  The substantive elements of the crime are defined by state law.  *Id*.  To convict Phillips of aggravated murder, the State had to prove that he purposely caused Sheila's death while committing or attempting to commit rape.  O.R.C. § 2903.01(B).

> *1.       Sufficient evidence showed that Phillips's beating of Sheila on January 18 caused her death*

Phillips argues that Sheila died not from his beating on January 18, but from intestinal injuries sustained on January 16, relying on testimony by Dr. Klein that these prior injuries would have led to Sheila's death by themselves if they had not been treated.  The Ohio Supreme Court rejected this argument, pointing to testimony from Dr. Cox that Phillips's January 18 beating caused Sheila's death, in part by rupturing her already-injured intestine.  *Phillips*, 656 N.E.2d at 656.  The district court reached the same conclusion.  *Phillips*, 2006 WL 2855077, at *17-19.

Phillips admitted to the police that he severely beat Sheila on the day of her death. Detective Ronald Perella of the Akron police department testified that Phillips admitted that he "got pissed off and began hitting Sheila all over her body, throwing her against the walls and dragging her by the hair." In Phillips's written statement to the police, he admitted that he:

> fliped [sic] out and I beat up Sheila by fist, stomach, (hit in stomach). A lot, hit hard, when hitting her I hit all over her body, and also threw her around, by trying to cool down. Not knowing how many times I hit her. (But I hit Shelia [sic] a lot) I was very mad at Shelia [sic] because she didn't respond to me. I pulled Shelia [sic] by her hair.

He also referred in his written statement to dragging Sheila from the bedroom to the living room, where he penetrated her anus with his fingers.

Medical evidence presented at trial supported the jury's finding that this beating caused Sheila's death. Dr. Cox, who performed the autopsy on Sheila's body, testified that on the day of her death she suffered numerous internal and external injuries from multiple blows, and that, based on a reasonable medical certainty, these blows caused Sheila's death. He elaborated:

> The cause of death is cardiovascular collapse; due to hypovolemic shock; due to intraperitoneal hemorrhage, hemorrhage into the soft tissue of the pelvis and into the lumen of the small and large bowel due to multiple acute contusions of the small and large bowel, with perforations of the duodenum, complicated by perforation of the superior mesenteric artery and vein, associated with compromise of the superior pancreaticoduodenal artery and vein; due to blunt force trauma, complicated by brain swelling with herniation.

Contrary to this evidence, Phillips argues that Sheila's death was caused by an earlier injury. Dr. Cox testified that Sheila had sustained severe blows to the abdomen about two days before her death that compressed her duodenum, a part of the intestine, against her second lumbar vertebra, disrupting the blood supply to the duodenum and "eventuat[ing] a necrosis." Dr. Eugene Izsak, the emergency room physician who treated Sheila on the day of her death, testified that her ruptured duodenum would have been a "fatal injury if left untreated." However, Dr. Cox opined that the beating Sheila

sustained two days later, on January 18, "ended up rupturing this already necrotic bowel." This testimony does not conflict with Dr. Izsak's testimony, and the jury was free to rely on Dr. Cox's opinion that the January 18 beating was the immediate cause of Sheila's death. The state court's determination that the evidence supported such a finding was not an unreasonable application of or contrary to the sufficiency-of-the-evidence standard set forth in *Jackson*, 443 U.S. at 319. *See* 28 U.S.C. § 2254(d)(1).

> 2.      *Sufficient evidence supported a finding that Phillips raped Sheila while beating her on the day of her death*

Phillips contends that the State failed to introduce sufficient evidence to allow a rational jury to find beyond a reasonable doubt that he raped Sheila on the day of her death. As a result, he claims that his aggravated murder conviction was unconstitutional. The Ohio Supreme Court rejected this claim, concluding that Dr. Cox's testimony was sufficient evidence to allow a jury to conclude beyond a reasonable doubt that Phillips raped Sheila in the course of the killing. *See Phillips*, 656 N.E.2d at 656. The district court agreed. *See Phillips*, 2006 WL 2855077, at *20-21.

Phillips admitted to police officers that in the course of beating Sheila on the day of her death he became sexually aroused when he realized she was not wearing underwear, and he penetrated her anus with his finger. He also admitted anally raping Sheila with his penis on at least two prior occasions. He stated to police officers that while he thought about raping Sheila on the day of her death, he did not do so. Dr. Cox testified that Sheila's anus was penetrated with an object significantly larger than a finger on the day of her death. He was able to determine this by examining the signs of hemorrhaging on microscopic sections of Sheila's anal region, uterus, and urinary bladder. Phillips argues that this testimony was implausible. He also relies on testimony by Dr. Izsak, who concluded that Sheila had been anally raped in the past but could not specify when the most recent rape had occurred. This testimony was not contradictory of Dr. Cox's. Furthermore, as the Ohio Supreme Court pointed out, Dr. Cox, as coroner, undertook a much more thorough examination than Dr. Izsak, who merely examined

Sheila when she was brought to the emergency room, so a reasonable jury could easily have placed greater reliance on Dr. Cox's opinion.

The Ohio Supreme Court's conclusion that sufficient evidence supported the jury's finding that Phillips raped Sheila while beating her on the day of her death was not an unreasonable application of or contrary to federal law. *See Jackson*, 443 U.S. at 319; 28 U.S.C. § 2254(d)(1).

> 3.     *The jury's finding that Phillips intended to kill Evans was supported by sufficient evidence*

Phillips argues that the State failed to introduce sufficient evidence to support the jury's finding that he purposely killed Sheila, claiming that he merely lost his temper. He argues that the fact that his blows were directed at non-vital areas and that he attempted to resuscitate Sheila show that he lacked the intent to kill. The Ohio Supreme Court rejected Phillips's arguments, ruling that sudden rage does not negate an intent to kill, that Phillips's attempt to save Sheila came more than an hour after the beating and was not determinative of his state of mind during the beating, that Phillips struck vital areas including Sheila's head, and that the "severe, protracted nature of the beating also indicates a purpose to kill." *Phillips*, 656 N.E.2d at 656. The state court also reasoned that "[t]he use of such substantial force by an adult on a three-year-old victim is certainly sufficient evidence from which a jury could reasonably find a purpose to kill." *Id*. The district court agreed. *Phillips*, 2006 WL 2855077, at \*19-20. Under the standard set forth in *Jackson*, the Ohio Supreme Court's denial of this claim was not unreasonable.

## D.     Comments by a grand juror

Phillips claims that comments made during a court recess by a grand juror to members of the petit jury in his case deprived him of due process and a fair trial. In denying this claim on direct appeal, the Ohio Supreme Court summarized the relevant facts as follows:

> [D]uring a trial recess, four jurors and one alternate left the courthouse to smoke. Eleanore Crowe, a member of a grand jury panel that was also in recess, was already outside when the jurors in the instant action

approached.  Crowe chatted with some of the jurors, mentioned that she was a grand juror, and then said something about the Phillips case.  All five jurors immediately returned to the courthouse and reported the comments to the bailiff.

*Phillips*, 656 N.E.2d at 660.  As the Supreme Court noted, the trial court proceeded to hold a hearing to determine whether the jurors had been biased by the grand juror's remarks:

> The trial court examined each of the jurors and Crowe.  Two jurors heard Crowe say that she hoped appellant "gets it" or "gets whatever he deserves."  One thought she said:  "The worst case that I was on was the Sheila Marie Evans case."  One juror heard only the words "Sheila Marie Evans," while another heard "Sheila Marie" and "Goddamn."  Jurors described Crowe's tone as "heated" or "agitated."  Three jurors expressed the belief that Crowe had served on the grand jury that had indicted appellant, although she had not.  All five of the jurors indicated that the experience would not influence their decision in the case.  At the conclusion of his examination of the jurors, the trial judge stated that he was "satisfied that they put it out of their minds, they're not going to consider it."  Despite this finding, appellant contends that Crowe's remarks fatally compromised the jury's impartiality.

*Phillips*, 656 N.E.2d at 660.  The Ohio Supreme Court went on to conclude that, under *Smith v. Phillips*, 455 U.S. 209, 216-17 (1982), and *Remmer v. United States*, 347 U.S. 227, 230 (1954), the trial court had conducted the required inquiry, had reasonably concluded that the jurors were unbiased by the contact, and had not abused its discretion in deciding to retain the jurors and proceed with the trial.  *Id*.  The Ohio Supreme Court further explained:

> [a] juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court.  Furthermore, the jurors' actions in this case reveal that they understood both the impropriety of Crowe's remarks and their own obligation to be fair.  First, when Crowe began speaking about [Phillips] and his case, the jurors immediately left the area and reported the contact to the bailiff.  Thereafter, each juror made a conscious decision not to discuss Crowe's comments with one another.

*Phillips*, 656 N.E.2d at 661 (internal citations omitted).  On habeas review, the district court found that the Ohio Supreme Court had reasonably applied federal law in denying Phillips's claim.

In reviewing claims of juror bias in the habeas context, we bear in mind that:  (1) the trial court must hold a hearing when the defendant alleges unauthorized contact with a juror; (2) no presumption of prejudice arises from the unauthorized contact; (3) the defendant has the burden of proving actual juror bias; and (4) juror testimony at the *Remmer* hearing is not inherently suspect.  *Zuern v. Tate*, 336 F.3d 478, 486 (6th Cir. 2003).  Due process requires a new trial only where the defendant demonstrates actual bias, not every time a juror is placed in a potentially compromising situation.  *See Smith v. Phillips*, 455 U.S. at 217.  Interpreting *Smith v. Phillips* and *Remmer*, we have held that the burden rests upon the defendant to demonstrate prejudice.  *See United States v. Zelinka*, 862 F.2d 92, 95 (6th Cir. 1988).

Following the jurors' reports of Crowe's contact with them, the trial court held a *Remmer* hearing at which the court and both counsel questioned all of the jurors and Crowe.  The court concluded, based on the jurors' actions and assurances, that they could be fair and impartial arbiters.  Phillips has not provided any reason to believe that the jurors' assurances should be viewed with suspicion or are unreliable, and he has not demonstrated any juror bias.  The Ohio Supreme Court's decision affirming the trial court's conduct was not contrary to or an unreasonable application of *Smith v. Phillips* or *Remmer*.  *See* 28 U.S.C. § 2254(d).

**E.       Phillips's claim that the trial court instructed the jury in his absence**

Phillips contends that the trial court erroneously gave the jury supplemental instructions when he and his counsel were not present.  The Supreme Court has held that

> A criminal defendant has the right to be present at any proceeding whenever his presence has a relation, reasonably substantial, to the fulness [sic] of his opportunity to defend against the charge. . . . [The] presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.

*United States v. Gagnon*, 470 U.S. 522, 526 (1985) (quoting *Snyder v. Mass.*, 291 U.S. 97, 105-06 (1934)). Phillips defaulted this claim by failing to raise it on direct review. Generally, to obtain review of a defaulted claim, a petitioner must demonstrate cause for the default and prejudice resulting from it. *See Murphy*, 551 F.3d at 502. However, these requirements do not apply if counsel was totally absent from a critical stage of the defendant's criminal proceedings; such an absence is constitutional error even without a showing of prejudice. *See United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984); *Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003).

Phillips is not excused from showing prejudice because the incident at issue was not a critical stage of his trial. During its guilt-phase deliberations, the jury sent the trial judge a note stating: "We wish to have the following defined again[:] 'Aggravated murder' with all included definitions[;] also 'Aggravated Murder' with 'Specification' with all included definitions." The record does not reflect that the court responded to the jury's request or issued any supplemental instructions. In response to an interrogatory issued with the federal habeas court's permission, the trial judge stated that he did not recall receiving this note but that his usual response to such a request is to provide the jury with a written copy of the jury instructions. The trial judge stated that he presumed he had followed this course on this occasion. The record therefore shows, and Phillips provides no reason to disbelieve, that the trial judge merely provided the jury with a written copy of the instructions he had already given them orally. Although certain instances of jury re-instruction and the reading of supplemental instructions qualify as critical stages of a trial, *see, e.g.*, *Valentine v. United States*, 488 F.3d 325, 335 (6th Cir. 2007); *Caver v. Straub*, 349 F.3d 340, 350 (6th Cir. 2003), the re-reading of identical jury instructions does not. *See Hudson*, 351 F.3d at 217. Providing the jury with a written copy of instructions that have already been delivered orally is not a critical phase of a trial. Therefore, Phillips is not excused from showing cause and prejudice, and, even assuming that he could show cause, he identifies no prejudice stemming from his counsel's absence during this event. The Ohio Supreme Court's decision denying this claim was neither contrary to nor an unreasonable application of *Gagnon*, 470 U.S. at 526.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Phillips's petition.

————————————

**DISSENT**

————————————

COLE, Circuit Judge, dissenting.  Phillips's crime is heinous.  Reading the facts of this case, as so vividly described in the majority's opinion, one cannot but feel a deep sense of moral revulsion and horror that one human being could inflict such acts on another.  It is for precisely this reason, however, that knowledge of Phillips's appalling childhood environment—the environment in which he spent his entire life prior to his crime, a world in which violence, criminal activity, and physical and sexual abuse of children were the status quo—is critical in assessing his culpability and determining the punishment he deserves.

The jury that recommended Phillips be sentenced to death, however, heard little evidence about his childhood because his counsel failed to investigate the red flags leading to a large body of mitigating evidence that would have considerably altered the picture of his culpability.  By failing to investigate these leads and to discover and present this mitigating evidence to the jury, Phillips's counsel failed to meet the minimum standard of competency required by the United States Constitution.  Because there is also a reasonable probability that, had counsel not failed to meet their constitutional responsibilities, at least one member of the jury would have found that the aggravating circumstances of Phillips's crime did not outweigh the mitigating circumstances, I would reverse the district court's denial of Phillips's petition for a writ of habeas corpus on this score.

### i. Counsel's performance was deficient

Under the constitutional standard we employ when reviewing ineffective-assistance-of-counsel claims, we must first determine whether counsel's performance "fell below an objective standard of reasonableness" and so was constitutionally deficient.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  Counsel has an obligation to perform a thorough investigation of the defendant's background or make

a reasonable decision that such investigation is unnecessary.  *See Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003).  This obligation exists even if the defendant is reluctant to cooperate or disclose mitigating evidence.  *See Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005).

Phillips's counsel, Kerry O'Brien and Michael Edminister, were alerted to the history of abuse in the Phillips home by two red flags: first, the existence of Summit County Child Services Bureau ("CSB") records beyond the five files that Edminister reviewed and described in his notes as "very important" for mitigation purposes, and second, the knowledge that CSB had come to the Phillips home to investigate an allegation that Phillips's father, William Sr., was sexually abusing Tanya, Phillips's sister.  Nonetheless, counsel failed to learn what the CSB files, other than the five to which they were given access, contained or to provide any of the information in those files to Dr. Brown, the psychologist charged with examining Phillips.  In fact, Edminister testified that he was "completely unaware of any familial violence" or that the CSB records indicated a long history of complaints and allegations of neglect, abuse, and assault in the Phillips household. (JA Vol. 10 at 5610.)  Edminister explained that he did not move the trial court to order CSB to provide him with full access to the records because he thought there was no chance of such a motion being granted: In his words, he "had never heard of that before and so I didn't even bother."  (JA Vol. 10 at 5604.)  His lack of knowledge may have been due to his never previously having worked on the mitigation phase of a trial; certainly, Phillips's post-conviction counsel do not appear to have had difficulty in obtaining an order requiring CSB to disclose the records.  This failure to undertake a full investigation of the CSB records, provide their contents to the psychologist who examined Phillips, and follow the new leads that the files would have generated amounts to constitutionally deficient performance.  *See Williams v. Taylor*, 529 U.S. 362, 395 (2000) (holding that counsel were ineffective because they "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records");  *Strickland*, 466 U.S. at 689-91 (stating that "counsel has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations unnecessary" and that "strategic choices made after less than complete investigation are reasonable" only "to the extent that reasonable professional judgments support the limitations on investigation"); *Johnson v. Bagley*, 544 F.3d 592, 600 (6th Cir. 2008) (finding deficient performance where counsel failed to read files obtained from a state agency that would have revealed a different mitigation strategy); *Jells v. Mitchell*, 538 F.3d 478, 478 (6th Cir. 2008) (finding deficient performance where counsel failed to investigate and locate files revealing the petitioner's unstable and abusive home environment or to present such files to the examining psychologist).  As Edminister himself acknowledged, "I suspect that I may have failed [Phillips] in not being more forceful in an attempt to obtain copies of all of these documents."  (JA Vol. 10 at 5617.)

It was not reasonable for counsel to rest their conclusion that no abuse had occurred on the assurances of Phillips's parents, as the abusers themselves cannot be assumed to be forthcoming about their own past crimes; nor did Phillips's own reticence excuse counsel from performing an independent investigation.  *See Rompilla v. Beard*, 545 U.S. 374, 389 (2005) ("No reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations whether they recalled anything helpful or damaging" contained in the file.); *Harries*, 417 F.3d at 638 (finding that counsel's failure to follow leads indicating a troubled childhood was deficient and that counsel has a duty to pursue such investigation even if the defendant refuses to cooperate); *Coleman v. Mitchell*, 268 F.3d 417, 449-50 (6th Cir. 2001) ("[D]efendant's resistance to disclosure of information does not excuse counsel's duty to independently investigate."). O'Brien and Edminister's admission that they distrusted Phillips further demonstrates the unreasonableness of accepting his assurances—despite their awareness of prior CSB involvement with the Phillips family—that no abuse had occurred.

According to the ABA Guidelines on death-penalty representation, which the Supreme Court has used in determining whether penalty-phase counsel's investigation of a defendant's background was deficient, *see Williams*, 529 U.S. at 396, defense

counsel should consider introducing evidence "'that would be explanatory of the offense(s) for which the client is being sentenced,'" as well as that which would provide insights "'into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offenses.'" *Johnson*, 544 F.3d at 599 (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.11(F) (rev. ed. 2003)). The commentary to the ABA Guidelines charges counsel with reviewing records from government agencies that "'can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse,'" such that "'[r]ecords should be requested concerning not only the client, but also his parents, grandparents, siblings, and children.'" *See Hamblin v. Mitchell*, 354 F.3d 482, 487 n.2 (6th Cir. 2003) (quoting ABA Guideline 10.7 Commentary at 80-83). If Phillips's counsel had met these professional standards, they would have learned of the wealth of mitigating evidence in the CSB records, which in turn would have enabled them to provide Dr. Brown—and the jury—with a true picture of the violent, abusive, and neglectful environment in which Phillips spent his life.

Not only did counsel fail to obtain these files or provide them to Dr. Brown, Edminister did not "remember even talking to Dr. Brown until he walked into the courtroom." (JA Vol. 10 at 5617.) When Edminister was asked whether, as the person "leading the charge on mitigation," it was possible for him to put together "an effective case without working hand in hand with Dr. Brown," Edminister replied: "Probably not." (JA Vol. 10 at 5617.) Nor, given that he delegated most of the responsibility for gathering records to a private investigator—one who, because of counsel's limited financial resources, had no experience in mitigation-related investigation—could Edminister have prepared an effective mitigation case without whatever evidence the investigator uncovered. Yet the private investigator did not begin attempting to develop information in support of mitigation until six days prior to jury selection in the guilt phase of Phillips's trial. Without such information, Phillips's counsel could not have begun preparing significant portions of their mitigation case until during or after the guilt phase. This untimeliness further supports the conclusion that counsel's performance was deficient. *See Williams*, 529 U.S. at 395 (finding it significant in holding counsel's

performance deficient that "counsel did not begin to prepare for [the sentencing] phase of the proceeding until a week before the trial"); *Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1995) (concluding that counsel's failure "to make any significant preparations for the sentencing phase until after the conclusion of the guilt phase . . . was objectively unreasonable").

When he did set about preparing a mitigation case, Edminister explained that he was at a loss as to what strategy he could pursue: "In this kid's case, we had absolutely nothing to work with, nothing. I mean, you know, everybody we talked to said . . . what a nice boy he was. [The crime] was so completely totally out of character. So then how do you develop mitigation . . . ?" (JA Vol. 10 at 5614.) As Edminister stated regarding his decision to call Phillips's father to testify at the penalty phase, "we were grasping, I was grasping at straws in an attempt to try and pull together any live bodies that could testify and say something nice about – say something at all about him . . . ." (JA Vol. 10 at 5618.) Significantly, Edminister himself did not find his mitigation strategy plausible: "You tell me how you explain to your client that . . . I don't believe you're telling the truth. I don't think you snapped. I think you are some underlying psychotic and we need to develop that in some way." (JA Vol. 10 at 5616.) Of course, as revealed by habeas counsel and described above, there was a wealth of material available for mitigation that Edminister would have discovered had he pursued the leads of which he already was aware. In light of Edminister's belief that the true explanation for Phillips's crime lay in Phillips's psychological condition, no reasonable counsel in Edminister's position would have abandoned the investigation at the point he did or failed to have a single conversation with Dr. Brown. *See Wiggins*, 539 U.S. at 524, 527 (explaining that, in assessing the reasonableness of counsel's investigation, the court considers whether the quantum of evidence known to counsel should have led to further investigation).

The state court, in concluding that counsel's performance was not deficient, relied on the fact that trial counsel presented several witnesses attesting to Phillips's good character and called Dr. Brown to testify about Phillips's "character deficiencies." For three reasons, this conclusion was an objectively unreasonable application of the

*Strickland* standard. First, Phillips's counsel could not have made a reasonable strategic decision not to introduce evidence of Phillips's abusive childhood environment because they failed to learn of it. *See Wiggins*, 529 U.S. at 521, 528, 533; *Williams*, 529 U.S. at 395; *Strickland*, 466 U.S. at 689-91. Second, even had counsel learned of the evidence, there would have been no strategic benefit to choosing not to present it. Informing the jury of the disadvantages Phillips faced in his everyday life only could have increased the effect of the positive pieces of mitigation evidence, such as the fact that Phillips had not used drugs and the testimony that Phillips was a helpful child. *See Williams*, 529 U.S. at 396 (reasoning that counsel's "failure to introduce the comparatively voluminous amount of evidence that did speak in [the defendant's] favor was not justified by a tactical decision to focus on [his] voluntary confession").

Third, the state court was objectively unreasonable in finding that the mitigation evidence that counsel failed to discover would have provided only an additional or alternative mitigation strategy. In making this conclusion, the state appeals court ignored the patent absurdity of counsel's attempt to persuade the jury that Phillips was a "kind" person "who cared deeply for Ms. Evans' children," *State v. Phillips*, No. 20692, 2002 WL 274637, at *10 (Ohio Ct. App. Feb. 27, 2002), despite the fact that the jury had just convicted him of raping and murdering one of those children. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to *plausible* options are virtually unchallengeable.") (emphasis added); *see also Johnson*, 544 F.3d at 603 (finding prejudice where competent counsel would have discovered evidence that would have altered considerably the mitigation theory presented to the jury). The mitigation evidence that counsel failed to discover would have given rise to a viable mitigation theory where none otherwise existed. Yet the state court inexplicably and unreasonably opined that such evidence "may actually have been less persuasive." *Id.* This conclusion cannot stand in light of the considerations above.

In sum, the state court's determination that Phillips's representation was constitutionally adequate unreasonably applies federal law as set forth by the Supreme Court.

### ii. Counsel's performance resulted in prejudice

The state court found that, even assuming that counsel were deficient, Phillips was not prejudiced by the jury's ignorance of the subsequently discovered mitigating evidence. Because the state court decided this constitutional issue in cursory fashion "'without extended discussion,'" this court applies a modified form of AEDPA review. *See Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005) (quoting *Harris v. Stovall*, 212 F.3d 940, 943 n.1 (6th Cir. 2000)). The modified-AEDPA standard of review requires that the court "conduct a careful review of the record and applicable law, but nonetheless bars [it] from reversing unless the state court's decision is contrary to or an unreasonable application of federal law." *Id.*

As the majority notes, to obtain relief under the prejudice prong of *Strickland*, Phillips is required to demonstrate a reasonable probability that the newly available mitigation evidence would have led to a different result. *Wiggins*, 539 U.S. at 537. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, if there is a reasonable probability that a single member of the jury would have found, based on both the newly-discovered and any previously introduced mitigation evidence, that the aggravating circumstances of the crime did not outweigh the mitigating circumstances, and if the state court's conclusion to the contrary was an objectively unreasonable application of federal law, Phillips is entitled to a new penalty-phase trial. *See Williams v. Anderson*, 460 F.3d 789, 804 (6th Cir. 2006); *Hamblin*, 354 F.3d at 493; *see also Wiggins*, 539 U.S. at 537. Phillips has met this burden.

In the mitigation phase of the trial, the jury was presented with a picture of Phillips as a "nice," "normal" young man, who generally was non-violent and "good with children." As noted, these claims were absurd in light of the jury's conviction. Edminister himself acknowledged that the portrayal of Phillips as a good kid who

snapped did not make sense.  The falsity of this story became even more apparent when Phillips's mitigation witnesses, including his convicted-felon parents, admitted on cross-examination that Phillips had struck Evans in the past and been suspended from school for violent outbursts.  Nor is it any surprise that Dr. Brown's testimony failed to reduce Phillips's culpability in the eyes of the jury.  Dr. Brown benignly described Phillips as "rather simple [and] emotionally immature" and unpersuasively explained the brutal rape and murder as the result of Phillips's "repeated frustrations in his life," which caused his "anger [to] build[] up so that it comes out and it seems way out of proportion to what may trigger it . . . ."  Such evidence was useless to a jury seeking to understand why a person could have done what Phillips did.

If Phillips's attorneys had pursued the leads of which they were aware, they would have discovered the mitigating evidence that would have allowed the jury to better understand what led Phillips to commit his horrific crime.  *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse."); *Johnson*, 544 F.3d at 604-05 (finding prejudice where no witness testified about the abuse and privation the defendant and his brother suffered as a way of life, and where evidence of the defendant's abusive childhood environment would have presented the jury with a plausible reason to spare the defendant's life).  Had counsel fulfilled their constitutional duty, the jury would have known that Phillips grew up undernourished and without adequate clothing in a house littered with dog feces and crawling with cockroaches.  They would have heard that his parents regularly bought shoplifted items from their drug-clientele, that as a seventh-grader he watched as his parents and half-sister were arrested in a drug raid at his home.  They would have heard that prostitution was common on the street in front of Phillips's home and that he was exposed to drugs and sexual activity at a young age because of parties thrown by his parents.  Most importantly, the jury would have heard of the repeated reports that the Phillips children were being severely abused.

The jury heard that Phillips was a normal, all-American boy who liked to play with model airplanes. The jury did not hear, however, what the CSB records and the affidavits of Phillips's half-siblings reveal: that he was surrounded by violence, without interruption, from the time of his birth to the age of nineteen. Instead of the rosy and wholly unbelievable picture Phillips's counsel presented, the jury should have heard that Phillips's father beat him, beat his mother, broke dishes over his half-sister's head when she failed to clean them properly, beat his twelve-year-old brother over the back with a two-by-four, and punched the children—male and female alike—in the face. They should have heard that Phillips's father regularly threw Phillips's half-brother and two half-sisters against the wall to punish them and grabbed Phillips's half-brother by the hair, just as Phillips would later do to Sheila. They should have heard that Phillips's father molested his half-sisters, one of whom was mentally retarded, and abused them while they were naked, even after they had reached high-school age, leaving bruises that lasted for a month. They should have heard that Phillips's half-brother Eddie believed his step-father was having sexual relations with Phillips's younger sister and that the CSB had investigated a similar allegation. But the jury heard none of this because, as Phillips's counsel admitted regarding the evidence they presented at the penalty stage, "we had absolutely nothing to work with, nothing." *See Johnson*, 544 F.3d at 604 (finding prejudice where, due to counsel's failure to investigate, the jury was misled into believing that the defendant's grandmother raised him properly and provided him with a stable life, when in fact both she and the defendant's mother provided the defendant with a violent, abusive childhood).

In describing the Phillips home as "an unpleasant living environment," the majority turns a blind eye to the abhorrent conditions that Phillips endured and their effect on his moral and emotional development. It is difficult to understand how the majority, in weighing the aggravating evidence against Phillips, can describe his crimes as "particularly heinous," while dismissing the violence he and his siblings suffered—acts of the same order of odiousness as those he committed—as merely "unpleasant." It is also difficult to understand the majority's argument that the fact that much of the undisclosed mitigating evidence focuses on the abuse of Phillips's siblings,

not Phillips himself, offers "towering" support for the conclusion that this evidence could not outweigh the aggravating evidence in the minds of the jury. Even were it to be shown that Phillips miraculously was spared the violence to which the other children in the household were repeatedly and brutally subjected, growing up in this environment and witnessing this abuse undoubtedly would have left its mark. But, in a household of rampant and indiscriminate violence, it beggars belief to suggest that Phillips was so spared. The testimony of Dr. Smith, armed with the evidence that Phillips's counsel failed to provide Dr. Brown at the penalty phase, offers a compelling argument as to why Phillips may not have shared this information. In his words,

> children who come from an abusive home, their first response is to deny that there's any abuse in the home. They are filled with guilt, shame, embarrassment. There's concerns about what other people will think. There is concern about reprisal within the family. Oftentimes, the child who breaks the code of silence will be rejected and shunned by other members of the family.

(JA Vol. 10 at 5761-62.). Yet despite Phillips's lack of disclosure, it was Dr. Smith's unequivocal opinion that Phillips had been abused:

> The difficulties Mr. Phillips has experienced with his interpersonal relationships, especially his sexual relations, strongly suggest that he was the victim of sexual abuse. The research has identified several characteristics of victims of sexual abuse (e.g., feelings of guilt and shame, difficulty with impotence, confusion about the role of sex-enmeshed with sadistic and masochistic behavior). Mr. Phillips reported many of these behaviors.

(JA Vol. 11 at 6590.) Incidentally, this conclusion is consistent with Phillips's otherwise jarring focus, when confessing his crimes to the police, not on being accused of murder or on the sentence he might receive, but rather on the fear of "get[ting] pumped in the butt" if sent to jail. *State v. Phillips*, 656 N.E.2d 643, 652 (Ohio 1995).

It appears incontestible that the jurors would have viewed Phillips differently had they heard a psychologist opine, based on traits that Phillips shared with many adult men who had been sexually abused as children, that Phillips had been sexually abused himself, and that his refusal to admit such abuse was unsurprising. Equipped with an

accurate picture of Phillips's background, Dr. Smith also could have testified, as he did at the habeas phase, that Phillips suffered from at least borderline personality disorder, if not a more serious disorder, as the direct result of the trauma he experienced in his formative years. He could have offered the jury an explanation for the otherwise inexplicable fact that Phillips, with encouragement from Evans, had raped a three-year-old girl. Finally, he could have testified, based on clinical experience, to the likelihood of what might otherwise have seemed impossible to the jury: that Evans, like other women with a history of abuse and mental illness, had encouraged and participated in the abuse of her own child, and that her sway over Phillips was due to his own childhood abuse and resulting personality disorder. Instead of hearing this evidence, the jury heard from Dr. Brown that, while immature and prone to frustration, Phillips had no mental problems and was essentially normal. *See Johnson*, 544 F.3d at 605 (finding prejudice because mitigation expert gave damaging testimony that he would not have given had he been provided "a more complete picture of [the defendant's] background—namely, the [defendant's] remarkably traumatic childhood").

The new evidence that Phillips could have introduced is the opposite of cumulative. Rather, it would have provided counsel, who was "grasping at straws," with a viable mitigation strategy. *See Rompilla*, 545 U.S. at 393 (finding prejudice where the evidence counsel failed to discover "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury"); *Morales v. Mitchell*, 507 F.3d 916, 951 (6th Cir. 2007) (noting that we have "found prejudice when the jury was deprived of non-cumulative mitigating evidence such as severe physical, psychological, or sexual abuse, a violent upbringing, or abject poverty"). The evidence withheld from the jury is similar to evidence that has led us to find prejudice in previous cases. In *Jells*, for example, counsel presented mitigation evidence focusing on the petitioner's quiet, non-violent nature and love of his family and called a psychologist who testified, like Dr. Brown did here, that the petitioner had borderline intelligence and difficulty controlling his hostility but no personality disorder or mental illness. 538 F.3d at 499. We found prejudice based upon evidence that Jells's counsel had failed to present that bears a striking similarity to that at issue here: Jells's mother was an alcoholic; Jells saw

his mother's boyfriends beat her and was occasionally beaten by them himself; Jells had a history of violence in school and learning and socialization impairments; and, as psychologists provided with an accurate description of Jells's history concluded, Jells's "abusive home environment had a profound impact on [his] psychological development." *Id.* at 499-500. Similarly, in *Hamblin*, we found that the petitioner was prejudiced when his counsel failed to present evidence of an unstable and deprived childhood characterized by extreme poverty, neglect, and family violence, as well as signs of a mental disability or disorder. 354 F.3d at 489-91. All of these elements are present here.

Numerous other decisions support the conclusion that counsel's deficient performance in this case prejudiced Phillips. In *Williams*, we found prejudice where, due to counsel's inadequate investigation, the jury never learned that petitioner "grew up in an environment[] in which there was an expectation that violence can and sometimes needs to be used, that people are constantly attempting to exploit others, and that illegal activities are often to be admired." 460 F.3d at 804-05. The other evidence that counsel failed to discover and present in that case would have shown that the petitioner's alcoholic mother frequently hit him, that his father left his mother when the petitioner was young, that his primary role model was an uncle who was a career criminal, that the petitioner was dependent on cocaine that induced paranoid fears at the time of the crime, and that he suffered from dyssocial reaction and mixed personality disorder. *Id.* This body of evidence is not materially different from the evidence in Phillips's case. Similarly, in *Johnson*, although some aspects of the abuse suffered by the petitioner were more severe than in this case, we found prejudice because the jury was not informed that abuse was "a way of life" during the petitioner's childhood. 544 F.3d at 604. We noted that a fully-informed psychologist would have opined to the jury that the abuse Johnson suffered caused his mental illness and that such a psychologist would have described to the jury "the cycles of generational abusive and neglectful parenting that repeat the same behaviors and lead to the same outcomes." *Id.* at 605-06 (internal quotation marks omitted). In *Harries*, we found prejudice where counsel's deficient investigation failed to uncover evidence of "Harries's traumatic childhood,

including the significant physical abuse Harries suffered at the hands of" his family, as well as the fact he spent much of his childhood in violent and unsanitary institutions; the fact that he suffered from a mental illness that may have been bipolar disorder, anxiety disorder, post-traumatic stress disorder, or antisocial personality disorder; and the fact that he had suffered frontal-lobe damage.  417 F.3d at 639.

In *Dickerson v. Bagley*, we found prejudice where counsel's inadequate investigation failed to reveal that the petitioner functioned only slightly above the retarded level and was raised in a home where his biological father denied his relationship and where he was called the "the moron" and surrounded by "pimps, prostitutes and drug dealers."  453 F.3d 690, 698-99 (6th Cir. 2006).  In *Carter v. Bell*, we found prejudice because counsel failed to present evidence "of a childhood in which abuse, neglect and hunger were normal," in addition to evidence that petitioner suffered from schizophrenia and psychosis.  218 F.3d 581, 600 (6th Cir. 2000).  In *Coleman*, we found prejudice where the jury never heard that petitioner was exposed to group sex and pedophilia, nor was told of petitioner's "probable mixed personality disorder with antisocial, narcissistic, and obsessive features," nor of the likelihood he had organic brain problems and manic-depressive disorder.  268 F.3d at 449, 451; *see also Glenn*, 71 F.3d at 1207 ("[T]he jury was given virtually no information on [defendant's] history, character, background and organic brain damage—at least no information of a sort calculated to raise reasonable doubt as to whether this young man ought to be put to death.").

In sum, this case is well within the range of this court's precedent finding prejudice resulting from ineffective assistance of counsel.  Even under our modified-AEDPA review, I find that the state court unreasonably applied *Strickland* when it failed to find that Phillips was prejudiced by counsel's failure to present to the jury the violent and abusive childhood revealed by the CSB records and his half-siblings' affidavits, or the testimony of a fully-informed psychologist who could attest that Phillips was sexually abused and suffered from, at the very least, borderline personality disorder. The undiscovered evidence would have allowed the jury to better understand how a nineteen-

year-old who had never lived outside the control of his abusive parents could have committed a crime of such shocking atrocity.  Phillips's culpability undoubtedly would have been reduced in the jury's eyes if they had known that his only male role model had taught him by life-long example that it was appropriate to physically and sexually abuse the children in one's care.  Viewed in relation to this evidence, Phillips's crime, atrocious as it was, becomes more comprehensible.  Had this evidence been presented by competent counsel, there is a reasonable probability that at least one juror would have voted not to put Phillips to death.