KAREN NELSON MOORE, Circuit Judge,
dissenting.
Raymond Tibbetts committed a reprehensible crime, and he should be punished for the acts for which the jury found him guilty. Despite his guilt, however, his death sentence is more than troubling. Tibbetts was sentenced to death by a jury that was not presented with mitigation evidence concerning Tibbetts’s mentally and physically abusive childhood that was key to understanding Tibbetts’s culpability and, by extension, evidence that was instrumental to determining whether he should live or die. Because I believe that Tibbetts’s counsel failed to provide constitutionally adequate representation during the penalty phase of his capital proceeding, and because I believe that Tibbetts was prejudiced by counsel’s actions, I would grant his petition for a writ of habeas corpus on this ground. I must therefore dissent.
“ ‘The benchmark for judging any claim of ineffectiveness must be whether counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.’ ” Broom v. Mitchell, 441 F.3d 392, 408 (6th Cir.2006) (quoting Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). To prevail on a claim of ineffective assistance of counsel under Strickland, Tibbetts must first show that his “counsel’s performance was deficient”; that is, that “counsel’s representation fell below an objective standard of reasonableness.” Strickland, 466 U.S. at 687, 688, 104 S.Ct. 2052. Even assuming deficient representation, however, Tibbetts is also required to show that the “deficient performance prejudiced the defense.” Id. at 687, 104 S.Ct. 2052. Moreover, Tibbetts is entitled to relief only if the Ohio courts’ “rejection of his claim of ineffective assistance of counsel was ‘contrary to, or involved an unreasonable application of Strickland, or it rested ‘on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.’ ” Porter v. McCollum, — U.S. —, 130 S.Ct. 447, 452, 175 L.Ed.2d 398 (2009) (per curiam) (quoting 28 U.S.C. § 2254(d)). Tibbetts argues that his counsel’s failure “to investigate and present” to the jury “compelling mitigating evidence” of Tibbetts’s upbringing and childhood abuse amounted to ineffective assistance of counsel such that he warrants relief from his death sentence. Appellant Br. at 23. For the reasons discussed below, I agree *448 with Tibbetts’s claim that counsel’s representation at the mitigation phase was constitutionally inadequate and that the state courts unreasonably applied Supreme Court precedent when rejecting Tibbetts’s claim on this ground.
I. ANALYSIS
A. Counsel’s Deficient Performance
Under the prevailing professional standards in existence at the time of trial, Tibbetts’s “counsel had an ‘obligation [either] to conduct a thorough investigation of [Tibbetts’s] background,’ ” Porter, 130 S.Ct. at 452-53 (quoting Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)), or to make a reasonable decision that such an investigation was unnecessary, Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Counsel’s “ultimate presentation” of mitigation evidence “to the jury might have been justified as the product of strategic choice” if “[b]uttressed by a reasonably adequate investigation,” but defense counsel was “ ‘not in a position to make ... reasonable strategic choices’ ” when “ ‘the investigation supporting [counsel’s] choices was unreasonable.’ ” Johnson v. Bagley, 544 F.3d 592, 603 (6th Cir.2008) (quoting Wiggins, 539 U.S. at 536, 123 S.Ct. 2527) (alterations omitted). Tibbetts’s counsel plainly did not engage in conduct sufficient to satisfy the constitutional norm, and I would hold that Tibbetts has succeeded in showing that counsel’s performance fell below an objective standard of reasonableness.
It is true that the instant case is distinguishable from some of our more egregious examples of deficient performance in that Tibbetts’s counsel did engage in some investigation in preparation for the penalty phase of Tibbetts’s trial. The post-conviction record indicates that counsel hired a mitigation specialist, Jim Crates. Joint Appendix (“J.A.”) at 13 (Release Form); id. at 14-15 (Crates Letter). The record also indicates that a little over one month prior to Tibbetts’s penalty-phase hearing, Crates interviewed Tibbetts’s ex-girlfriend and the mother of his son, Robin Amburgey. 6th Cir. Dkt. Doc. 006110643575 (Trial Ex. N, Crates Notes). Notwithstanding counsel’s retention of Crates and Crates’s conversation with Amburgey, however, counsel’s preparation and investigation stands out more for what it utterly lacked. First, neither counsel nor Crates interviewed even one member of Tibbetts’s family prior to the day of the commencement of the mitigation phase despite the fact these family members could have provided counsel with extremely relevant information concerning Tibbetts’s abusive childhood. It is clear that counsel knew the whereabouts of at least two family members — Tibbetts’s father and sister— because, according to an affidavit from Tibbetts’s father, Stanley Tibbetts, Crates contacted him sometime “before Raymond’s trial,” and said that he would like to speak with Stanley about Tibbetts. Although Tibbetts’s father agreed to speak with counsel, Crates “never contacted [Stanley] again,” and neither Crates nor trial counsel “[]ever showed up to talk.” Tibbetts, S. Aff. at ¶ 2. According to his post-conviction affidavit, the only reason that Tibbetts’s father did not speak with counsel was because no one ever asked. “No ‘reasonable professional judgment’ could have supported a decision not to interview” Tibbetts’s father, and the failure to do so amounted to deficient performance. Johnson, 544 F.3d at 600 (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052, and concluding that counsel was deficient in failing to interview the petitioner’s “mother, not a distant aunt or neighbor”); Jells v. Mitchell, 538 F.3d 478, 493 (6th Cir.2008) (finding deficient per *449 formance where counsel “interviewed only three family members, neglecting to speak with many other family members who had lived with [the petitioner] and were available”).
With regard to Tibbetts’s sister, Suzanne Terry, the record indicates that Crates also contacted her but that he did so “the day before [she] was needed to testify in court on [her] brother’s behalf,” Terry Aff. at ¶ 2 (emphasis added), which hardly left sufficient time for counsel to prepare a mitigation strategy surrounding whatever information Terry could provide. See Beuke v. Houk, 537 F.3d 618, 644 (6th Cir.2008) (“We will generally find that an attorney has rendered deficient performance if he waits until after a conviction to begin his mitigation investigation.” (citing cases)); Jells, 538 F.3d at 493-94 (same). Furthermore, there is no indication that counsel or Crates actually spoke with Terry once they contacted her. Instead, the evidence reveals merely that Crates referred Terry to Dr. Weaver and that Terry spoke with Dr. Weaver on the morning of the penalty-phase hearing. Even assuming that Dr. Weaver relayed all of Terry’s information to counsel in the few hours immediately preceding the hearing, counsel certainly would not have had time to incorporate that information into any reasonable mitigation theory or to followup on any leads that Terry’s information uncovered.
It is also important to note that the only reason that Tibbetts’s sister did not testify was a direct result of counsel’s dilatory investigative tactics. Again, it is worth emphasizing that Crates did not contact Terry until the day before the hearing. Terry Aff. at ¶ 2. Despite the short notice, Terry agreed to testify on the condition that her testimony not be filmed. Anticipating that this might prove problematic, Terry also offered to testify on film if she were given the opportunity to notify her employer and her clients that she was participating in a capital case and explain the matter. Presumably because the hearing was scheduled to begin the next day, Crates told Terry that accommodations were impossible and that it would be “good enough” for her to speak with Dr. Weaver and that Dr. Weaver would relay her testimony to the jury. Id. Terry affirmed that she would have testified without qualification had she known that the details of her conversation with Dr. Weaver would not have reached the jury. As with counsel’s failure to interview Tibbetts’s father, no reasonable judgment justified counsel’s decision to wait until the day before the mitigation hearing to contact Tibbetts’s sister to request that she testify.
Second, in addition to failing to speak with anyone in Tibbetts’s family, counsel made no real “attempt to locate significant persons from [Tibbetts’s] past who may have provided valuable testimony regarding mitigating factors.” Powell v. Collins, 332 F.3d 376, 399 (6th Cir.2003). As the affidavits from Tibbetts’s childhood friend, Sandra Nunley, and his Alcoholics Anonymous (“AA”) sponsor, Keith Riddell, indicate, however, there were at least two non-related persons willing to provide such information. In fact, Crates even recognized this, writing a letter to counsel two months before the penalty phase stating that there was “Limited or No Documentation” from AA and that someone “must interview [Tibbetts’s AA] sponsor.” J.A. at 14 (Crates Letter). According to Rid-dell, however, no one ever did. In short, counsel’s failure even to “take the first step of interviewing witnesses,” Porter, 130 S.Ct. at 453, such as Tibbetts’s father and friends, and to do so in a timely manner, in the case of Tibbetts’s sister, was unsupportable, objectively unreasonable, and, as a result, plainly constitution *450 ally deficient, cf. Bobby v. Van Hook, — U.S. —, 130 S.Ct. 13, 18-19, 175 L.Ed.2d 255 (2009).
It is true that Tibbetts’s counsel did request, approximately one month prior to the start of trial, several records concerning Tibbetts’s history and childhood, which included documents from the Ohio Department of Human Services, St. Elizabeth Hospital, Tibbetts’s previous employers and high school, as well the Ohio Department of Corrections. And it is also true that these records were provided to the jury to review during its sentencing deliberations. But the fact that counsel requested these records and provided them to the jury does not overcome counsel’s clear investigative deficiencies. As an initial matter, it is unlikely that many of these documents could have been much help to Tibbetts, regardless of their substantive content. Many of them are illegible from years of copying; they are disorganized, at least as submitted in the record on appeal; and they cover literally decades of foster-care placements and admissions to various institutions without any accompanying explanation to place them in context. Furthermore, the records concern not only Tibbetts’s upbringing but also that of his numerous siblings who, depending on the year, were not even living with Tibbetts, which made some of the records simply irrelevant, or at least less clearly pertinent. As we have stated previously, “it hardly constitutes a reasonable investigation and mitigation strategy simply to obtain Human Services records from the State, then dump the whole file in front of the jury without organizing the files, reading them, eliminating irrelevant files or explaining to the jury how or why they are relevant.” Johnson, 544 F.3d at 602.
Even assuming that counsel was not deficient in the handling of the records — i.e., that they were legible, organized, and clearly relevant such that no explanation from counsel was required — the substantive content of the records serves only to highlight counsel’s investigative deficiencies as opposed to insulate and justify counsel’s actions. The records themselves contain very little definitive information about whether Tibbetts suffered abuse as a child, but they do contain ample speculative statements from social workers and other officials that plainly would have put reasonable counsel on notice that further investigation into Tibbetts’s upbringing was required. For example, the Ohio Department of Human Services records indicate that Tibbetts was “afraid of water because someone had tried to hold him under,” 6th Cir. Dkt. Doc. 006110646585 at 15; that social workers were concerned that the Merrimans, Tibbetts’s first foster-care family, were “not adequately] nourishing the children,” id. at 20; and that there were allegations from the older Tibbetts children that the “younger children,” including Tibbetts, “were actually abused” at the Merrimans’ home, 6th Cir. Dkt. Doc. 06110646582 at 38. The records also recounted the detailed allegations of abuse leveled by Tibbetts’s biological mother and Tibbetts’s sister. As recounted by one state social worker:
[Tibbetts’s mother believes that] Mrs. Merriman [does not] feed [Tibbetts’s younger brother] enough, so his brain is suffering. [Tibbetts’s mother] also had a great deal to say about the poor treatment the children are receiving at the Merriman’s, saying Suzanne is now telling her the many cruelties they received; couldn’t watch TV, were beaten if they soiled their pants, were tied in bed, didn’t get to eat after school — had to go outside or to bed, beat Suzanne’s ear — if she didn’t cry, beat her harder. Suzanne says she couldn’t talk before because she would be beaten if anything got' back to the Merrimans. Ricky veri *451 fies these statements adding the Merrimans had eggs or french toast for breakfast, but the Tibbetts always had oatmeal. [Tibbetts’s mother] said all the children are skeletons now.
6th Cir. Dkt. Doc. 006110646585 at 25. In addition to these very clear red flags, there were also ample cryptic statements throughout the various records hinting at the existence of abuse, including the fact that the state social workers refused to allow the Tibbetts children to be taken to the Merrimans, even for a visit, after they had been removed from that placement, and at least one social worker suspected that Tibbetts’s time with the Merrimans “created [his] nervous disposition,” 6th Cir. Dkt. Doc. 006110646583 at 6, and noted that contact with the Merrimans led Tibbetts to rock himself to sleep at night.
Additionally, despite the majority’s assertion to the contrary, the fact that the sole mitigation witness, forensic psychologist Dr. Glen Weaver, testified at Tibbetts’s mitigation hearing and conveyed some 'of the information that Tibbetts’s sister had provided him just hours prior to his testimony and some of the information that was alluded to in the various records does not save counsel’s eleventh-hour investigation. See Johnson, 544 F.3d at 602 (“[A]n unreasonably truncated mitigation investigation is not cured simply because some steps were taken prior to the penalty-phase hearing and because some evidence was placed before the jury.” (citing Rompilla v. Beard, 545 U.S. 374, 382-83, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005))). To be sure, Dr. Weaver conducted a thorough psychological exam and was qualified to testify as to Tibbetts’s mental state at the time of the crime, which was necessary for the mitigation theory that the defense decided to present, but Dr. Weaver’s understanding of the reality of Tibbetts’s childhood was extremely limited, and he was not equipped to testify as to that aspect of Tibbetts’s social history. For example, to obtain information about Tibbetts’s past and prepare for the mitigation hearing, Dr. Weaver merely reviewed the documents introduced in the penalty phase, J.A. at 1132-33 (Weaver Test.), and met with Tibbetts for approximately six hours, id. at 1120-21. Like counsel, Dr. Weaver did not interview Tibbetts’s family members or close friends prior to the day of the hearing and surprisingly voiced a strong aversion to doing so. See Mason v. Mitchell, 543 F.3d 766, 777 (6th Cir.2008) (finding problematic the fact that a psychiatrist “based his examination and report solely on interviewing [the defendant] himself and ... did not cover [his] background or childhood in any great detail”). In fact, when the prosecutor noted that Dr. Weaver had failed to interview third parties when evaluating Tibbetts, Dr. Weaver testified that it “certainly” was not his job to do “independent investigation” and that doing so was “rare” and perhaps inappropriate. J.A. at 1185-86 (Weaver Test.).
In short, counsel’s investigation fell below the then-prevailing professional standards, and the fact that counsel uncovered and introduced some evidence does not excuse counsel’s failure to engage in basic preparation, such as conducting interviews with ready and willing family members and friends and organizing and explaining any relevant state records regarding Tibbetts’s childhood. Had counsel contacted Tibbetts’s family and friends at some point prior to the mitigation hearing, Dr. Weaver, who knew very little about Tibbetts’s background, would not have been tasked with presenting the sole evidence about Tibbetts’s upbringing, which he amassed, in substantial part, during an interview hastily conducted with Tibbetts’s sister on the morning of the hearing. Tibbetts’s father, his sister, his best childhood friend, and his AA sponsor could have each pro *452 vided material details about Tibbetts’s background and humanized Tibbetts to a degree that Dr. Weaver simply was not able to do.[1]
Given counsel’s failure to interview even the most obvious of mitigation witnesses, this case is plainly distinguishable from those cases where the Supreme Court and this Circuit have held that counsel’s investigation and presentation of mitigation evidence was the result of a reasonable decision and did not amount to deficient performance. Cf. Wong v. Belmontes, — U.S. —, 130 S.Ct. 383, 387, 175 L.Ed.2d 328 (2009) (indicating that the mitigating evidence that counsel presented “was substantial,” where defense counsel “put nine witnesses on the stand[,] ... [a] number of those witnesses highlighted [the defendant’s] ‘terrible’ childhood,” including the father’s alcoholism and abuse, the very poor conditions of the defendant’s house, his poor performance in school, and the death of his younger sister and grandmother with whom he had a strong relationship); Van Hook, 130 S.Ct. at 18-19 (2009) (holding that counsel’s mitigation investigation was adequate with regard to both timing and scope where counsel “spoke nine times with [the defendant’s] mother (beginning within a week after the indictment), once with both parents together, twice with an aunt[,] ... and three times with a family friend,” met with several experts “more than a month before trial,” enlisted a mitigation expert “when the trial was still five weeks away,” and could not have been expected to interview “distant relafives”); Phillips v. Bradshaw, 607 F.3d 199, 209-10 (6th Cir.2010) (“In his efforts to acquire mitigating evidence, [the attorney] talked with [the defendant’s] mother and father, at least one of his siblings and one of his half-siblings, his grandparents, neighbors, and former teachers. [The attorney] obtained [the defendant’s] school records and reviewed some [Child Services Bureau] records relating to the [the defendant’s] family,” and at the mitigation hearing the defendant’s neighbor, grandmother, brother, and father testified); Sneed v. Johnson, 600 F.3d 607, 610 (6th Cir.2010) (distinguishing the Supreme Court’s recent decision in Porter and holding that counsel’s investigation of mitigating evidence was sufficient when “counsel produced 17 witnesses, including three psychological experts, at least some of whose testimony concerned [the defendant’s] mental health and severely troubled childhood”). I would thus conclude that Tibbetts’s counsel’s performance fell below an objective standard of reasonableness, and counsel was constitutionally deficient.
B. Counsel’s Deficient Performance Prejudiced Tibbetts
Beyond showing that counsel was deficient for failing to investigate and present mitigating evidence, Tibbetts must further show that counsel’s actions were prejudicial. The majority concludes that Tibbetts failed to demonstrate prejudice because any additional evidence that counsel failed to uncover or present would have been cumulative.
*453 We have stated that we “reject a requirement that any later-identified cumulative mitigating evidence must have been introduced in order for counsel to be effective.” Clark v. Mitchell, 425 F.3d 270, 286 (6th Cir.2005); id. at 286-90 (surveying cases); see also Beuke, 537 F.3d at 645. And, according to our case law, “ ‘to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way — in strength and subject matter-from the evidence actually presented at sentencing.’ ” Broom, 441 F.3d at 410 (quoting Clark, 425 F.3d at 286) (alteration omitted). The question is thus whether the additional mitigation evidence concerning Tibbetts’s mentally and physically abusive childhood and upbringing differs in strength and subject matter from the evidence introduced such that there is “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. As explained below, I believe that the evidence does demonstrate that Tibbetts was prejudiced and that a contrary conclusion is unreasonable.
At mitigation, Dr. Weaver’s testimony on Tibbetts’s abusive childhood consisted of the following:
[Tibbetts] had a miserable childhood. Horrible.... The parents were both drug users. His father was, in addition to an alcoholic. He and two of his siblings, brothers, all of them who have been in difficulty with the law, were cared for by a 10-year-old sister, whom I talked with this morning incidentally. And when the Welfare Department — or Human Services found out about this, or when it was reported, they stepped in. And there was a continuing contact with Human Services from 1961 or '62, throughout those years, and he and his brothers were taken for foster home placement. Not very happy ones, according to his sister.... And he had several placements ... which were not satisfactory. Like, they were too punitive with him. Matter of fact, the sister reported that he and his two brothers were tied in bed at night so they would not be any problem. No sheets, no pillows, no pillow case or anything. Treated more like animals. The[re] wasn’t any [nurturing] of him or the other sibling.
J.A. at 1125-26 (Weaver Test.). Tibbetts’s unsworn statement regarding his childhood revealed that Tibbetts did not “like to talk about [his] childhood because [he] never did like it,” that he “didn’t 'like going home” because he “didn’t like to hear the hollering[ and] the belts,” and that “there was no family love.” J.A. at 1220-22 (Tibbetts Statement).
The evidence discovered in post-conviction materials, however, revealed a much more chaotic and abusive environment, including never-before-revealed details about Tibbetts’s abuse at the hands of his biological parents. For example, Terry submitted an affidavit disclosing that Tibbetts’s biological mother and father were “cruel” and engaged in “extreme violence” toward the children, requiring Terry to protect Tibbetts and the younger siblings from the blows of their parents. Terry Aff. ¶ 6. Terry also revealed that Tibbetts’s mother and father failed to provide their children with basic needs, leaving them “alone often without food or proper clothing,” id. ¶ 7, and the children had to rely on people from the community to donate such items, lest they go hungry and cold. Tibbetts’s father also “brutalized” Tibbetts’s mother, “beating her bloody with a fan and a telephone,” id. ¶ 8, and, in general, the household where Tibbetts lived with his biological parents “was a place of constant violence,” id. ¶ 8. In addition to Terry’s recollection of these *454 events, an affidavit from Tibbetts’s father submitted during post-conviction proceedings revealed that he would have testified first-hand that he and Tibbetts’s mother were unable to care for their children. Tibbetts, S. Aff. ¶¶ 3, 4.
Once removed from the biological household, Tibbetts did not fare any better. One of the foster-care mothers, Ms. Merriman, was a drug addict, “wacked out of her head,” and never took care of Tibbetts. Terry Aff. ¶ 11. In fact, far from becoming a safe space for the already-abused Tibbetts, the foster-care mother’s own biological children “brutalized” Tibbetts and his siblings by kicking them down the stairs, beating them with spatulas, and burning their hands on heat registers, which sent at least one child the hospital. Id. ¶ 12. The Merrimans essentially treated Tibbetts like an animal. He was required to sit in the corner of the kitchen all day long until bedtime, id. ¶ 11, at which point he was tied to the bed. Although Dr. Weaver did mention this detail, perhaps equally disturbing is how this task was accomplished: Ms. Merriman would lash “rope around [Tibbetts’s] waist[ ] that dug into [his] stomach[ ],” id. ¶ 11, causing pain throughout the night. Moreover, Ms. Merriman “never fed” the children while in the foster-care home, id. ¶ 13, and locked them outside for long periods of time without access to a toilet, causing one of Tibbetts’s siblings to have a bowel impaction, id. ¶ 14. Mr. Merriman also abused the Tibbetts children, and according to Terry, he attempted to molest her sexually on at least one occasion while they were residing in the Merriman home. Id. ¶ 14. Tibbetts’s father’s affidavit indicated that he and Tibbetts’s mother knew that the children were being mistreated in foster care but did nothing. Tibbetts, S. Aff. ¶¶ 3, 4. Ultimately, Tibbetts’s mother gained authorization to remove her children from the Merrimans’ care, but she decided to take only two of them, leaving Tibbetts behind. According to Terry, when it came time for the others to leave, her mother ignored Tibbetts, “act[ing] like [he] did not exist,” and she “refused to even see” Tibbetts when he came to visit. Id. ¶ 15. Tibbetts’s father confirmed that Tibbetts’s mother simply wanted nothing to do with Tibbetts. Tibbetts, S. Aff. ¶¶ 3, 4. Perhaps Tibbetts’s mother’s cruelty and emotional abuse was not entirely surprising, however, as post-conviction materials also revealed that she likely had a “borderline personality” disorder and was a “dangerous” individual. Id. ¶ 17. The State finally removed Tibbetts from the Merriman home, and Tibbetts was placed with a second family, where he was not treated much better. Id. ¶ 19.
The evidentiary hearing also revealed that had counsel contacted Tibbetts’s childhood friend, Sandra Nunley, counsel would have learned that once Tibbetts exited the foster-care system he was still denied an environment conducive to normal childhood development. The Children’s Protestant Orphanage where Tibbetts was sent following foster care was “very strict,” and although it was not physically abusive, the children were not permitted to do much of anything. Nunley Aff. ¶ 3. Nunley recounted that the people who ran the orphanage provided “no affection” or “nurturing” and there was “no opportunity to get close to or bond with any of the adults,” id. ¶ 4, which was what Tibbetts most desired. Moreover, Tibbetts “never received visits from anyone,” which was “[u]nlike the other children” at the orphanage, id., and Tibbetts was never allowed to engage in activities with friends after school or participate in normal social functions, id. ¶ 5. Nunley also would have explained to the jury that Tibbetts so yearned for affection that she and Tibbetts *455 often broke the rules in order to see one another. Id. ¶¶ 6-7.
This additional evidence is not cumulative but instead adds real substance to the story of Tibbetts’s childhood that was conveyed to the jury. For example, the undisclosed evidence reveals Tibbetts’s mental and physical abuse at the hands of his biological mother and father, which was not presented to the jury during the penalty phase. Cf. Eley v. Bagley, 604 F.3d 958, 969 (6th Cir.2010) (“Although the evidence presented at the post-conviction hearing did go into more depth than the evidence presented by trial counsel at sentencing, it did not cover any new subject matter and was not substantially more persuasive than the trial evidence.”). The additional evidence also provides “shocking, disheartening, and utterly disturbing details about [Tibbetts’s] upbringing,” Beuke, 537 F.3d at 646, and does not merely elaborate on a difficult childhood that had been described already by several witnesses. See Williams, 529 U.S. at 398, 120 S.Ct. 1495 (finding prejudice where the evidence that was not disclosed provided a “graphic description of [the petitioner’s] childhood, filling with abuse and privation”); cf. Wiles v. Bagley, 561 F.3d 636, 639 (6th Cir.2009) (“Most of the ostensibly new evidence represents variations on th[e] same theme” presented at the penalty phase); Beuke, 537 F.3d at 646 (concluding that details such as the fact that the petitioner had low self-esteem and was sheltered when growing up did not support a finding of prejudice despite being noncumulative); Broom, 441 F.3d at 410. To the contrary, as outlined above, none of Tibbetts’s family or friends had been interviewed or testified about the details revealed in the post-conviction hearing, and Dr. Weaver’s description of Tibbetts’s childhood as “miserable” or “horrible,” or even Dr. Weaver’s example of Tibbetts’s foster family as being “too punitive” by tying the children to the bed, does not even come close to conveying the extent and gravity of Tibbetts’s torture and abuse. The two foster-care placements were more than just “not satisfactory,” as Dr. Weaver testified, but rather they were abusive. In essence, “rather than being cumulative,” the evidence that counsel failed to uncover and present “provides a more nuanced understanding of [Tibbetts’s] psychological background and presents a more sympathetic picture of [Tibbetts]” that is sufficient to support a finding of prejudice. Jells, 538 F.3d at 501; see Johnson, 544 F.3d at 604 (finding prejudice where “not one witness testified about the abuse that [the petitioner] suffered as a way of life” (internal quotation marks omitted)); cf. Broom, 441 F.3d at 410 n. 27 (holding habeas relief was not warranted when the additional mitigation evidence included “the fact that [Defendant] was placed in a juvenile detention facility as a teenager, that a close friend of [Defendant’s] was shot and killed, and that [Defendant’s] father was a pimp.”).[2]
*456 Even assuming, however, that the majority is correct that sufficient details about Tibbetts’s abuse were introduced via Dr. Weaver’s testimony, I remain unconvinced that Tibbetts was not prejudiced by counsel’s deficient performance and failure to call lay witnesses such as Tibbetts’s sister, father, and friends. First, had Tibbetts’s family and friends testified, the evidence regarding Tibbetts’s childhood abuse would have come directly from individuals who experienced the same abusive environment as Tibbetts and even from one individual who actually inflicted some of the abuse. Having those individuals testify as to what Tibbetts endured certainly would have had a greater impact on the jury than just listening to Dr. Weaver mention Tibbetts’s childhood abuse vaguely and in passing. Second, it is important to remember one of the State’s tactics during the penalty phase was to challenge the legitimacy of the defense’s mention of childhood abuse, however minimal the reference. Thus, even assuming that the testimony from the above-mentioned lay witnesses would not have uncovered evidence different in substance from that which was introduced — again, a proposition with which I do not agree — the evidence certainly would have been different in strength based on its source. Throughout the hearing, the State attempted to undermine the mitigation value of Tibbetts’s abusive childhood by implying that the defense was fabricating any mention of such abuse. For example, when Dr. Weaver spoke vaguely about the problems that Tibbetts had in foster care, the prosecutor pointed out that “[t]he information [Dr. Weaver was] telling ... the jury [wa]sn’t in [the children’s services records].... This [information was] in a conversation [that Dr. Weaver] had with [Tibbetts’s] sister at some other time which [the court and the jury] have nothing about.” J.A. at 1171 (Weaver Test.). The State also noted that the records contained no information about Tibbetts’s abusive childhood, id. at 1170, and, to the contrary, indicated that the State had monitored appropriately Tibbetts’s placement in foster care, implying that any claim that the placements were problematic was exaggerated, if not an outright lie, id. at 1172. As mentioned above, the State’s claim regarding the various records was not far from the truth. Again, the records contained surprisingly little in the way of definitive evidence that Tibbetts was raised in a mentally and physically abusive environment, and much of the mention of abuse was couched in terms of speculation and possibilities with social workers reporting rumors of abuse but never making any determination or conclusion. Based on the evidence that counsel submitted at mitigation, then, the jury could have deliberated with the erroneous impression that Tibbetts was never actually abused as a child, which the evidence revealed in post-conviction proceedings shows is clearly not the case. In short, had counsel relied on first-hand accounts about Tibbetts’s abusive home and foster-care placements, the State would have been unable to challenge so readily the little evidence of Tibbetts’s abusive childhood that was conveyed.
Furthermore, I cannot turn a blind eye in the prejudice analysis to the fact that the effectiveness of the defense’s sole mitigation witness, Dr. Weaver, was undermined by several of his statements characterizing Tibbetts as a dangerous individual, even when sober. When trial counsel asked Dr. Weaver whether Tibbetts had the ability to control himself and his impulses, Dr. Weaver stated:
*457 When I saw him the first time, I guess that I got a little concerned about my own safety____When I saw him initially, and when he came in, the air when I had — when I looked at him, you know, I’m not going to cross him. I’m not going to cross him. This was even in the Justice Center in the medical department there.... It was more of a— more of an open-ended interview which I had with him for the most part, about things. I didn’t push him. I’m concerned about my own safety.
J.A. at 1139 (Weaver Test.). These statements not only cast Tibbetts in an extraordinary negative light, but they also weaken the legitimacy of the mitigation theory on which the defense relied — that drugs and alcohol precluded Tibbetts from being able to appreciate his criminal acts or control himself. After all, the only witness who had been called to make the case to spare Tibbetts’s life was, in reality, concerned about Tibbetts’s inability to control himself even when lucid, sober, and incarcerated, thus implying that it might not have been the drugs and alcohol that induced the crime. Dr. Weaver’s statements did not escape the prosecutor, who emphasized them on cross examination:
Q: You were apprehensive of this man at that time when you walked in to sit down to see him.
A: Sort of bad vibes that I had when he walked in the room, yes sir.
J.A. at 1162 (Weaver Test.).
In short, the evidence that counsel failed to uncover and introduce through Tibbetts’s family members and friends differs in both substance and strength from that introduced via Dr. Weaver, Tibbetts, and the official records. As in Porter, the jury at Tibbetts’s “original sentencing heard almost nothing that would humanize” him “or allow them to accurately gauge his moral culpability.” Porter, 130 S.Ct. at 454. And the type of mitigation evidence that trial counsel failed to uncover and introduce — that Tibbetts was abused as a child — is markedly different from the evidence that supported defense counsel’s chosen mitigation theory. Evidence of childhood abuse certainly would “have elevated the jurors’ sympathies for [Tibbetts],” Beuke, 537 F.3d at 645, in a way that evidence of his intoxication and drug abuse would not. As a panel of this Circuit stated in Wiles v. Bagley, “it is hardly self-evident that getting high on barbiturates before stabbing someone to death is the kind of evidence that makes a capital defendant look better in the eyes of a court as opposed to making him look even worse.” Wiles, 561 F.3d at 640 (internal quotation marks and alteration omitted). But it is impossible to conclude that evidence of his mistreatment as a child would not have provided a compelling reason to find Tibbetts less morally culpable and spare him a death sentence. “Mitigating evidence unrelated to dangerousness may alter the jury’s selection of penalty, even if it does not undermine or rebut the prosecution’s death-eligibility case.” Williams, 529 U.S. at 398, 120 S.Ct. 1495.
As a final response to the majority’s claim that counsel was not constitutionally deficient and that Tibbetts was not prejudiced, I emphasize that the Supreme Court recently made clear that it has “never limited the prejudice inquiry under Strickland to cases in which there was only little or no mitigation evidence presented.” Sears v. Upton, — U.S. —, 130 S.Ct. 3259, 3266, 177 L.Ed.2d 1025 (2010). Instead, the Court noted that it has found “deficiency and prejudice” in cases such as the instant case, where “counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase,” id. (citing Williams, 529 U.S. at 398, 120 S.Ct. 1495; Rompilla v. *458 Beard, 545 U.S. 374, 378, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), and Porter, 130 S.Ct. at 449), but failed to uncover and present compelling mitigation evidence related to another, legitimate and consistent theory,[3] cf. Wong, 130 S.Ct. at 385 (“[Counsel] understood the gravity of [the] aggravating evidence [of guilt], and he built his mitigation strategy around the overriding need to exclude it.”). Indeed, the case that the majority selects to demonstrate lack of prejudice, Phillips v. Bradshaw, 607 F.3d 199 (6th Cir.2010), is inapposite because in Phillips the additional mitigation evidence conflicted with counsel’s mitigation strategy. In Phillips, “[t]he majority of the additional evidence [would have] contradicted] the theory that [the defendant’s] counsel presented during the mitigation phase,” and “a different approach [to mitigation] would have been required if the totality of the mitigating evidence [had been] presented.” Id. at 217. Here, as shown above and in contrast to Phillips, the -additional evidence of first-hand accounts of Tibbetts’s childhood abuse would have provided compelling reason for the jury to conclude differently at the penalty phase.
C. Counsel Was Constitutionally Ineffective
The constitutional infirmities that plagued the penalty phase of Tibbetts’s capital trial are unfortunately frequent. Yet again in this Circuit, however, a majority of a panel casts aside obvious and prejudicial errors by upholding a death sentence issued by a jury that was not informed of key mitigation evidence that could have made a difference in whether the jury decided that Tibbetts should die for his admittedly horrible crime. For the reasons discussed above, I believe that Tibbetts has shown that his trial counsel was constitutionally ineffective during Tibbetts’s penalty phase. Counsel was clearly deficient in his investigation of mitigating evidence. Although he hired a mitigation specialist and requested several records from a variety of educational and medical institutions, counsel failed to follow up on the specialists’ leads and explain the rele *459 vanee of the introduced documents. Moreover, counsel called only one mitigation witness, who was not properly equipped to discuss Tibbetts’s childhood. Most disturbingly, however, counsel failed to interview Tibbetts’s family and friends, despite their willingness to provide information. Counsel’s performance was constitutionally deficient.
In addition, counsel’s failure to uncover significant details about the abuse that Tibbetts suffered as a child was prejudicial. The information uncovered in post-conviction proceedings “paint[ed] a significantly more detailed picture of [Tibbetts’s] troubled background” than the scant evidence introduced at the penalty phase, Jells, 538 F.3d at 499. The nonintroduced evidence provided numerous details of Tibbetts’s abuse while in foster care and disclosed, for the first time, Tibbetts’s abuse while under the care of his biological parents. In addition to providing additional substance, had counsel uncovered and presented the evidence disclosed during post-conviction proceedings, the jury would have heard the horrors of Tibbetts’s upbringing from first-hand sources, and Tibbetts would have been able to stymie the State’s attack on the truthfulness of Tibbetts’s claims that he was abused. Presented with such evidence, the jury would have been provided with an alternative, much more compelling case for sparing Tibbetts’s life. Because the Ohio Court of Appeals unreasonably applied clearly established law in concluding that counsel was not constitutionally ineffective, I would GRANT the writ of habeas corpus on this claim.
II. CONCLUSION
For the reasons discussed above, I would REVERSE the district court’s judgment and GRANT Tibbetts’s petition for a writ of habeas corpus on the basis of his second assignment of error. I respectfully dissent.

. Tibbetts’s former girlfriend and his son's mother, Robin Amburgey, testified briefly during the guilt phase of the trial for the prosecution, and this testimony was submitted to the jury in mitigation. Amburgey’s testimony during the guilt phase of the trial did provide some "humanizing” details with regard to Tibbetts. She mentioned that Tibbetts had periods of sobriety and had attempted to kick his drug habit, J.A. at 404, 408 (Amburgey Test.), that Tibbetts was never violent towards her or their son, id. at 405, and that Tibbetts cared for their son, played with him, and was a good father, id. at 406-07. But she provided no testimony concerning Tibbetts’s upbringing.

. The Supreme Court of Ohio’s description of the background evidence that was presented in mitigation further reveals the extent to which salient details about Tibbetts’s abuse simply were not disclosed during the penalty phase. The entirety of the Supreme Court of Ohio’s description is as follows:
The defense presented evidence about Tibbetts’s background, which offers some modest mitigating value. Dr. Weaver described Tibbetts’s childhood as "miserable” and "horrible.” Because Tibbetts’s parents were drug users, Tibbetts and his siblings were placed in foster care at an early age. Tibbetts spent most of his childhood living in either a foster home or an orphanage. Tibbetts eventually achieved some success in high school as a member of the football team, but suffered a knee injury that ended his high school football career. At an early age, however, he began a pattern of getting *456 into trouble with the authorities and eventually spent time in prison.
State v. Tibbetts, 92 Ohio St.3d 146, 749 N.E.2d 226, 258 (2001).

. The State’s reliance on Brooks v. Bagley, 513 F.3d 618, 626 (6th Cir.2008), and Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir.2007), is unconvincing. In Brooks, a panel of this Circuit held that the petitioner was not prejudiced by counsel’s actions, even assuming deficient performance, because the information contained within the post-conviction affidavits was either presented verbatim at trial, Brooks, 513 F.3d at 625-26, 629, or not of the type that would have helped, id. at 627 (indicating the additional information consisted solely of Defendant's “belief in voodoo,” the "accusation that [Defendant’s wife] was having an incestuous relationship with the couple’s oldest son,” and the Defendant’s "refusal to allow his oldest son to display athletic trophies”). As outlined above, however, that is not the case here. Furthermore, unlike the instant case, the trial record in Brooics directly contradicted many of the claims in the post-conviction affidavits, id. at 626-27, 628, and many affidavits failed to state what information the affiants would have provided had they been contacted before the trial, id. at 630.
Nields is likewise distinguishable. In Nields, a panel of this Circuit first determined that counsel was not deficient, Nields, 482 F.3d at 453, and then concluded that the undiscovered additional mitigating evidence was "relatively weak” regardless, id. at 454. That additional evidence in Nields would have revealed that the petitioner's " ‘childhood home life was chaotic and neglectful,' that 'he was an expert and dedicated musician whose life was once very focused,’ that 'he had several successful employment experiences and was a hard worker,' that 'he did not drink while he was working,’ and that he ‘was a dependable, kind-hearted friend and an extremely helpful, friendly person.' ” Id. (quoting defendant's brief). The type of undiscovered additional evidence in Tibbetts's case is of a different character. It does not show simply that Tibbetts could be a good guy. It details his very traumatic, even tortured, childhood and upbringing.